710 A.2d 1112

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Chad FRANCISCUS, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 16, 1996.

Decided April 2, 1998.

Vincent P. DiFabio, Paoli, for Chad Franciscus.

Stuart Suss, West Chester, Nicholas J. Casenta, Jr., for the Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

### OPINION

ZAPPALA, Justice.

We granted allocatur in this case to address the issue of whether Chad Franciscus's right to assistance of counsel under the Sixth Amendment of the United States Constitution and under Article I, Section 9 of the Pennsylvania Constitution was violated by the admission at trial of incriminating statements made by him to a jailhouse informant. For the following reasons, we find that the admission of the statements violated Franciscus's right to assistance of counsel guaranteed by the federal and state constitutions and that a new trial is required.

On September 30, 1991, Michael Devine left his house to go to high school. Devine decided to skip school with some friends. Later that evening, Devine went to a convenience store to purchase cigarettes and did not return.

On October 15, 1991, the Parkesburg Police Department received an anonymous letter indicating the location of a body and naming Franciscus as the killer. The Parkesburg Police contacted the Pennsylvania State Police at the Embreeville barracks to conduct a search for the body. The body was identified as Devine's. A broken pair of eyeglasses was found at the scene.

The letter to the police was written by a friend of Franciscus, Reuben Armstrong. Armstrong was interviewed later by Pennsylvania State Troopers Joseph Joy and Laurie Dougherty. Armstrong told them that Franciscus had described to him how he had murdered someone and that Franciscus had shown him where the body was located.

Based upon this information, Franciscus was arrested and charged with the murder. At the time of his arrest, Franciscus was seventeen years old. He was imprisoned at the Chester County prison in maximum security pending his trial. During that time, prison officials transferred an inmate from the general population to maximum security and placed the inmate near Franciscus's cell. The inmate, Daniel Krushinski, befriended Franciscus and spoke with him extensively about the murder charge. Krushinski then disclosed the information to the State Troopers who were responsible for the investigation.

A pre-trial motion was filed by defense counsel seeking to suppress Krushinski's testimony regarding oral and written statements made by Franciscus. The motion asserted that Franciscus's rights under the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution had been violated. The evidentiary hearing held by the trial court disclosed the following.

On January 23, 1992, Krushinski was transferred to the Chester County prison as an accommodation to Lancaster County. Only seven days after his arrival, Krushinski contacted Detective Corporal Jay Hess of the East Whiteland Police Department to discuss information regarding an armed

robbery investigation that Detective Hess was involved in. Krushinski's attorney contacted Hess first to explain that his client wished to speak to him about the armed robbery; Krushinski's phone call then followed.

Krushinski informed Detective Hess that he had information that would help him in prosecuting the case. A meeting between Krushinski and Detective Hess was arranged for the next day. The meeting took place as scheduled. Also present at the meeting was Pennsylvania State Police Trooper Jim Boyd of the Embreeville barracks. Trooper Boyd had also been contacted by Krushinski's attorney on January 30, 1992.

Anticipating that his efforts would prove beneficial to him, Krushinski provided information about an inmate of the Chester County prison named Verbiski, who had been charged with armed robbery. Krushinski informed the troopers that Verbiski wished to have certain witnesses intimidated or harmed and apprised them of Verbiski's effort to escape from the prison. Based upon this information, Trooper Boyd decided to follow up on Verbiski's plan to intimidate witnesses. Trooper Boyd developed a plan for an undercover detective to be "hired" by Verbiski for that purpose and to record conversations with Verbiski. As a result, Verbiski was eventually charged with harassment and intimidation of witnesses.

On February 5, 1992, Joseph Carroll, Esquire (First Assistant District Attorney of Chester County) met with Krushinski, Detective Hess, Trooper Boyd, and Chester County detectives. Krushinski was awaiting sentencing by the Lancaster County Court of Common Pleas. An agreement was entered into at the meeting that the law enforcement officials would be available to testify upon request that Krushinski had provided information to them in the Verbiski prosecution. It was understood that the law enforcement officials would appear to testify at the Lancaster County sentencing proceeding, but the agreement was not limited to that proceeding. The agreement was approved by the district attorney's office.

The agreement to testify on Krushinski's behalf was not the only benefit that arose from Krushinski's efforts. Detective

Hess and Trooper Boyd deposited $45.00 into Krushinski's prison account after Krushinski came to them with his information. Krushinski had told other inmates, including Verbiski, that he had connections on the outside. Krushinski felt that he could not keep up his facade if he did not have any money in his prison account. The officers agreed to supply him with the money for this purpose.

During this time, Detective Hess had several conversations with Lieutenant Edward Zunino of the Kennett Square Police Department relating to Krushinski. Krushinski had contacted Lieutenant Zunino and had offered to provide him with information in a separate case involving another Chester County prison inmate named Hamm. Krushinski indicated that he had obtained Lieutenant Zunino's name from Detective Hess. After Krushinski had given him information that was helpful to one of his investigations, Lieutenant Zunino agreed to testify about his cooperation when requested. He was aware that Krushinski was to be sentenced by the Lancaster County Court of Common Pleas.

The information that Krushinski provided to Lieutenant Zunino led to the arrest of another individual other than Hamm on February 14, 1992. The arrest warrant indicated that Krushinski had supplied information as to the charges. When this information became known in the Chester County prison, Krushinski was confronted by inmates and assaulted. Krushinski called to inform Lieutenant Zunino of these events and told him that he wanted to be removed from the Chester County prison. Lieutenant Zunino contacted the captain of security at the prison, Donald Dougherty, and asked him to remove Krushinski from the cell block where he was being housed for safety reasons. He then went to meet Krushinski at the prison. At the time they met, Krushinski had not been moved within the prison. Captain Dougherty was asked to transfer Krushinski and to initiate the necessary procedure. Krushinski was transferred that same day to the maximum security cell block.

Lieutenant Zunino gave Krushinski his home phone number. After his transfer, Krushinski called Lieutenant Zunino

no less than twenty times. Krushinski did not want to remain in maximum security, but wanted to be transferred out of the Chester County prison. Krushinski also informed Lieutenant Zunino that he was working with the Pennsylvania State Police in Embreeville on a murder case. Lieutenant Zunino was unsure when that conversation occurred, but indicated that Krushinski was still in the Chester County prison at the time.

The section of maximum security that Krushinski was transferred to contained fourteen cells, including that of Franciscus. Franciscus's cell was separated from Krushinski's cell by one other cell. Krushinski immediately engaged Franciscus in conversations about the homicide charges and offered his assistance based upon his supposed connections outside of the prison.

On February 19, 1992, five days after his transfer to maximum security, Krushinski requested that his attorney contact Trooper Laurie Dougherty at the Embreeville State Police barracks. Trooper Dougherty was aware of Krushinski's involvement in the Verbiski case and his dealings with Trooper Boyd when she received this call. The attorney informed her that Krushinski had been trying to contact her to supply her with information about a homicide case that she was investigating, but that the desk had not accepted the collect phone calls. The attorney asked that she accept a phone call from Krushinski that she should expect immediately. Trooper Dougherty agreed and the call which briefly followed was accepted.

Krushinski asked if she was interested in information pertaining to Franciscus. Trooper Dougherty inquired as to what information he could supply. Krushinski indicated that Franciscus had admitted that he had killed Michael Devine and had provided specific details about the murder weapon and clothing that he had worn. Krushinski also stated that Franciscus had supplied him with a list of names of witnesses who would testify in his defense. Trooper Dougherty informed him that she would arrange a meeting with the District Attorney who was prosecuting the case, Robert Miller, Esquire.

Arrangements were made that day to bring Krushinski into the District Attorney's office for an interview. A court reporter was brought into the office to record a statement that was taken from Krushinski at that time. The next day, Krushinski was transferred out of the Chester County prison. Thus, in a span of only twenty-eight days, Krushinski had secured information that was used by the State Police and local law enforcement authorities in three separate cases. On April 3, 1992, prior to the Franciscus trial, a guilty plea hearing was held by the Lancaster County Court of Common Pleas on charges brought against Krushinski for theft by deception and impersonating a public servant. State Police Troopers Laurie Dougherty and Joseph Joy, who were involved in the investigation of Michael Devine's death, Trooper Stone, and Detective Hess appeared to testify regarding the assistance that Krushinski had provided in the three cases.

Franciscus's motion to suppress was denied by the trial court. The court determined that Krushinski was not acting as a government agent at the time he had his conversations with Franciscus.

At trial Krushinski testified extensively about his efforts to obtain information from Franciscus. This testimony established that from the moment Krushinski first came into contact with the teenager, he relentlessly questioned Franciscus about the details of the homicide charge. The conversations with Franciscus began over a game of chess. Krushinski deliberately elicited information from Franciscus under the guise of helping him through connections that Krushinski said he had outside of prison. Krushinski told Franciscus that he was part of an organized crime family. He asked Franciscus for the names and telephone number of his parents. Krushinski recommended an experienced criminal trial attorney from the city of Philadelphia.

Krushinski made notes of his interrogation of Franciscus. In their first conversation, he questioned Franciscus about the evidence that the police had and his clothing on the day of the murder, and he tried to get a description of the dagger that Franciscus claimed to possess. At that point they had to

return to their cells, which were only six feet apart. Krushinski immediately began passing notes to Franciscus between the cells to obtain additional information about the charges.

Krushinski used the notes to get Franciscus's handwritten responses to his questions, such as whether Franciscus or his friends knew Michael Devine. Krushinski testified that Franciscus's response was that the person he killed did not know him and as far as he knew none of his friends knew Devine either. Krushinski also directed Franciscus to draw a diagram of the area where the crime had occurred because he was unfamiliar with it.

Krushinski further testified that Franciscus told him in detail about how he struggled with Devine and stabbed him, how he got rid of his knife, and about items that had been taken from the victim. Franciscus also told him that he lost his glasses and a lighter during the confrontation. In addition to passing notes between their cells, Krushinski also exchanged books with Franciscus. Krushinski sent some of the notes that he wrote on pages of books that were delivered to the inmates in carts. Before Krushinski was transferred from the prison, he placed one of these books containing notes into a mailing envelope addressed to his relatives. Krushinski later retrieved the book from his parents' home.

Krushinski was extremely aggressive in his efforts to gain information incriminating to Franciscus. He spoke to Franciscus about the matter throughout each day he was in maximum security. Krushinski testified at trial about Franciscus's incriminating statements and writings. On direct examination, Krushinski described one of the many notes that he passed to Franciscus, which was introduced into evidence, as follows:

Q. And what is that document?

A. Okay. Now this is when—I think I already testified to this. I was asking him if his friend knew the murder— the murder victim or if he knew him before that. And then this was his response, response back to me.

Q. Will you describe for the jury how it was that each of you had something to do with that document?

A. We had talked about this Mike Devine. I was curious just if any of his friends knew him, so I wrote out this— this note to him. Okay. I passed it over to him. He read it and later on passed it back to me.

Q. And what did you ask him in that note?

A. I asked him: Do you know about the guy you killed? Did you ever talk to him? Did you ever see—see you together in school or anywhere else? [sic] Did any of your friends know him who might, you know, turn on you? Did you tell any—any of your other friends things about it? And get back to me.

And then he wrote his response back to me.

N.T. September 8, 1992, p. 1002. Franciscus dutifully answered the questions and returned the note. When Krushinski felt that he had obtained enough information from Franciscus, he contacted the State Police.

Franciscus was convicted of first degree murder, robbery and possession of an instrument of crime. Post-trial motions were filed, as well as a motion for new trial based upon after-discovered evidence. A second hearing was scheduled for the motion based on after-discovered evidence. During the earlier suppression hearing, Trooper Boyd had testified that Krushinski provided information only in the Verbiski matter. Trooper Boyd testified at the post-trial hearing that when he and Detective Hess interviewed Krushinski about Verbiski on February 4, 1992, Krushinski also had handed him a letter that contained information Krushinski had obtained from another Chester County prison inmate about statements the inmate had made about his involvement in an armed robbery. On April 6, 1994, the trial court denied the post-trial motions.

On December 5, 1994, Franciscus was sentenced to life imprisonment without parole on the murder conviction, a consecutive imprisonment term of 18 months to 10 years for robbery and 5 years probation consecutive to the robbery count. A panel of the Superior Court affirmed the judgment

of sentence in a memorandum opinion, with two members of the panel concurring in the result.

Franciscus asserts that the trial court erred in admitting Krushinski's testimony. He contends that the Commonwealth's use of this evidence violated his right to counsel guaranteed under the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution.

In *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the United States Supreme Court considered whether a defendant's Sixth Amendment right to assistance of counsel was violated by the admission at trial of incriminating statements made by the defendant to a co-conspirator who had agreed to cooperate with government agents in their continuing investigation of the defendant's alleged involvement with narcotics. The defendant, a merchant seaman, had been arrested for possession of narcotics aboard a United States vessel. His co-defendant was charged with conspiracy and facilitation of the sale of narcotics.

Both men were released on bail. Without the defendant's knowledge, the co-defendant consented to the installation of a radio transmitter in his automobile so that government agents could monitor conversations carried out in the vehicle. The defendant made incriminating statements during the course of a conversation while sitting in the parked car.

The agent who intercepted the conversation testified at trial to the defendant's statements. The defendant asserted that his Sixth Amendment rights were violated by the use of the statements that the government agents had deliberately elicited from him after he had been indicted and in the absence of his retained counsel.

The Supreme Court held that the defendant had been denied the basic protections of the Sixth Amendment, relying upon its earlier decision in *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). In *Spano*, the Supreme Court had reversed a state criminal conviction because a confession obtained from the defendant after he had been

indicted was improperly admitted into evidence at trial. The Supreme Court concluded that the confession had been deliberately elicited from the defendant at a time when he was clearly entitled to an attorney's help. The protections afforded to a defendant at trial were found to be applicable after the indictment, otherwise the defendant would be denied "effective representation by counsel at the only stage when legal aid and advice would help him." *Spano,* 360 U.S. at 326, 79 S.Ct. at 1209 (Douglas, J. concurring).

Although the interrogation in *Spano* took place in the police station, the Supreme Court applied its reasoning to the interception of the defendant's conversation in *Massiah.* The Court emphasized that for the rule to be efficacious, it must apply to indirect and surreptitious interrogations as well, finding a more serious imposition in *Massiah* because he was unaware that he was under interrogation by a government agent. The Court re-emphasized the constitutional principle established in *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), that the most critical period of the proceedings, from the time of a defendant's arraignment until the beginning of trial, demands that a defendant receive the assistance of counsel because thorough investigation, consultation and preparation are vitally important.

The rule of *Massiah* was reaffirmed in *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In *Henry,* the issue presented was whether the defendant's Sixth Amendment right to assistance of counsel was violated by admission at trial of incriminating statements made by the defendant to his cellmate, an undisclosed government informant, while in custody. The defendant, who had been indicted for armed robbery of a bank, was in a city jail awaiting trial.

Government agents contacted an inmate at the jail who previously had been a paid informant for the Federal Bureau of Investigation. The inmate was specifically instructed not to initiate any conversation with the defendant or to question him regarding the bank robbery. The agent told him to be alert to any statements made by the defendant. The inmate reported that the defendant had told him about the robbery; he

was then paid for furnishing the information. The inmate testified against the defendant at trial. The jury was not informed that he was a paid government informant and convicted the defendant. When the defendant learned that he was an informant, he challenged the introduction of that testimony.

The Supreme Court found that the government had deliberately elicited incriminating statements from the defendant within the meaning of *Massiah*, and that the defendant's Sixth Amendment right was violated by intentional creation of a situation likely to induce the making of incriminating statements without the assistance of counsel. The court identified three factors considered to be important. First, the inmate was acting under instructions as a paid government informant. Second, the inmate was ostensibly no more than a fellow inmate. Third, the defendant was in custody and under indictment at the time he was engaged in conversation by the informant.

The Court determined that the inmate was not a passive listener, but rather had engaged the defendant in conversations which produced the incriminating statements. The Court noted that "[e]ven if the agent's statement that he did not intend that [the inmate] would take affirmative steps to secure information is accepted, he must have known that such propinquity likely would lead to that result." 447 U.S. at 271, 100 S.Ct. at 2187. The unique pressures of the prison environment were recognized. "Confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." 447 U.S. at 274-75, 100 S.Ct. at 2188-89.

This dynamic is particularly significant where the government agent is an inmate. When the defendant is unaware of the status of the informant, "[c]onversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents." 447 U.S. at 273, 100 S.Ct. at 2188.

The Supreme Court addressed the issue again in *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

The defendant and a co-defendant were charged with theft by receiving vehicles and automotive parts. After being released on bail, the co-defendant was offered a deal that no further charges would be brought against him if he testified against the defendant and otherwise cooperated in the defendant's prosecution. The co-defendant agreed to cooperate and consented to have a recording device placed on his telephone to record the defendant's calls.

When the telephone surveillance failed to produce any inculpatory statements, the police obtained the co-defendant's consent to wear a body wire transmitter to record conversations at a meeting arranged with the defendant. The co-defendant was instructed not to attempt to question the defendant. Nevertheless, the co-defendant repeatedly asked the defendant to remind him about the details of the incidents, claiming to have a poor memory. This prompted the defendant to make incriminating statements. At trial, the prosecutor introduced portions of the tape recordings from the meeting.

The Supreme Court held that the defendant's Sixth Amendment rights had been violated because the State knowingly circumvented his right to have counsel present at a confrontation between the defendant and a police agent.

> Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect or preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

474 U.S. at 170–71, 106 S.Ct. at 484.

█ The Court noted that direct proof of the State's knowledge will seldom be available to a defendant, but its

absence will not defeat a defendant's claim that his right to assistance of counsel has been violated. Proof that the State must have known that its agent was likely to obtain incriminating statements from the accused in the absence of counsel will be sufficient to establish a violation. 474 U.S. at 176, 106 S.Ct. at 487, n. 12.

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. *Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.*

474 U.S. at 176, 106 S.Ct. at 487 (citation omitted) (emphasis added).

The line of decisions issued by the United States Supreme Court did not address the Sixth Amendment right to assistance of counsel in the context of a jailhouse informant who repeatedly provides information to police without specific direction from the police.[1] Thus, we lack specific precedent that would be determinative of Franciscus's claim that his Sixth Amendment rights were violated. We are guided, however, by the Supreme Court's dictate that, in determining whether the Sixth Amendment has been violated, the focus is on

1. In *Henry,* supra, the Supreme Court specifically reserved the issue where an informant is placed in close proximity but makes no effort to initiate conversations about the crime charged. 447 U.S. at 272, 100 S.Ct. at 2187, n. 10.

whether the government failed in its affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking the right to counsel.

We applied that guideline in *Commonwealth v. Moose*, 529 Pa. 218, 602 A.2d 1265 (1992). The issue presented was whether statements surreptitiously obtained by a jailhouse informant violated the defendant's Sixth Amendment rights where the informant was acting pursuant to an implied understanding with the district attorney. The defendant asserted that the district attorney had entered into an understanding with the jailhouse informant that he would remain in the county jail without sentence being imposed on his murder and robbery convictions in return for information, which included a confession allegedly made by the defendant.

During a post-trial evidentiary hearing, the district attorney testified that his office had an implied understanding with the informant to inform the office about statements allegedly made by other inmates. The district attorney testified that the informant was not directed to gather information and that there was no specific understanding. As long as the informant supplied the district attorney's office with information, however, his sentencing was deferred.

We held that the defendant's Sixth Amendment rights were violated by the admission of the informant's testimony and granted a new trial. We found that the Commonwealth had knowingly circumvented the defendant's Sixth Amendment rights.

Although the district attorney denied that he instructed [the informant] to gather information, it is clear from the testimony that [the informant] was acting as an agent of the Commonwealth when he was in jail. [The informant] had been in the county jail for three years waiting to be sentenced; the Commonwealth repeatedly delayed sentencing every time [the informant] produced a new confession. Although the district attorney may not have given [the informant] specific instructions, it is clear that [the infor-

mant] was well aware of what he had to do while in jail to get a good recommendation at his sentencing.

It is not significant that [the informant] was not planted for the purpose of gaining information from a targeted defendant. The fact that the Commonwealth intentionally left him there to harvest information from anyone charged with a crime and awaiting trial is the villainy. The vast majority of people in county jail are charged with crimes and awaiting trial and they have a right to counsel when interrogated about the crimes with which they are charged.

529 Pa. at 229, 602 A.2d at 1270.

We concluded that the informant was an agent for the Commonwealth who expected to receive a lenient recommendation in exchange for information. We noted that the situation was distinguishable from the case in which an inmate unexpectedly comes forward with incriminating information about a fellow inmate, or where an informant is a passive listener to a heartfelt confession.

We find that this case is similar to *Moose*. Although Krushinski's initial contacts with the Pennsylvania State Police and local police in connection with the Verbiski matter were unexpected, Krushinski's subsequent agreement with them that they would inform the Lancaster County Court of Common Pleas of his cooperation at the time of his sentencing altered their relationship. The subsequent contacts and information provided by Krushinski must be viewed in the context of the agreement.

In addition to the express understanding that the information provided by Krushinski would be rewarded with the appearances of the law enforcement officers at the sentencing proceeding, the officers encouraged and assisted Krushinski in his efforts to obtain information from other inmates. State Police Trooper Boyd and Detective Hess deposited funds into Krushinski's prison account after the agreement had been entered into relating to Verbiski. This was intended to help Krushinski perpetuate his facade before other inmates that he had connections outside of the prison that would be helpful to

them. Since this occurred after Krushinski had already given information about Verbiski to the State Police and local police, and the money was not negotiated as part of the agreement relating to Verbiski, this promoted Krushinski's surreptitious efforts to obtain information from other inmates. There was an implicit understanding that such efforts would be rewarded by the police.

The police officers continually communicated with Krushinski throughout his stay in the Chester County prison. Within two weeks of his initial contact regarding Verbiski, Krushinski supplied the officers with information about two more inmates in addition to Franciscus. This additional information clearly did not come to the officers through "luck or happenstance." When Krushinski's efforts to cooperate with the police were discovered and he was attacked by another inmate, the police reacted immediately to protect him.

Krushinski's subsequent transfer to maximum security allowed him to continue his activities as a police informant because those inmates had no contact with the other inmates. This gave Krushinski the opportunity to manipulate 17–year old Chad Franciscus to his advantage. Krushinski deliberately set out to elicit inculpatory information from Franciscus. Franciscus's youth and inexperience made him particularly susceptible to Krushinski's claim of connections outside of prison and pressure tactics.

Krushinski was not "a passive listener to a heartfelt confession" by Franciscus. Krushinski conducted a deliberate interrogation of Franciscus intended to evoke an inculpatory disclosure. The interrogation was conducted while Franciscus was awaiting trial. There obviously was no disclosure of Krushinski's status as an informant.

It is of no moment that the police did not give specific instructions to Krushinski to target any particular inmate. Krushinski was encouraged to obtain whatever useful information he could. We cannot ignore the fact that communications of this nature are promoted by rewarding jailhouse informants for information. In the absence of a reward, whether it be

pecuniary or in the form of an agreement to testify regarding the informant's assistance to the police, there would be no incentive for informants to aid law enforcement agencies.

When interrogation is conducted by a 'police officer, the defendant is informed that his statements may be used to prosecute him. He may seek the advice of counsel before making any statements. When interrogation is conducted by an undisclosed jailhouse informant, however, the defendant has no reason to know that any inculpatory statements may be used in his prosecution or that consultation with counsel is advisable.

■ We find that in this case the Commonwealth knowingly circumvented Franciscus's Sixth Amendment right to counsel. The admission of Krushinski's testimony requires a new trial.[2]

■ Franciscus asserts that his right to counsel under Article I, Section 9 of the Pennsylvania Constitution was also violated by the introduction of Krushinski's testimony. Although we have held that Franciscus's Sixth Amendment right to counsel was violated, we must also undertake an independent analysis under the Pennsylvania Constitution.

A state may provide through its constitution a basis for the rights and liberties of its citizens independent from that provided by the Federal Constitution. The decisions of the U.S. Supreme Court are not dispositive of questions regarding the rights of citizens of the Commonwealth of Pennsylvania under its own constitution.

*Commonwealth v. Hess*, 532 Pa. 607, 620, 617 A.2d 307, 313 (1992).

■ In *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), we noted,

Here in Pennsylvania, we have stated with increasing frequency that it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution each time a provision of that fundamental docu-

2. We need not address Franciscus's remaining claims of trial error in view of our disposition of this issue.

ment is implicated. Although we may accord weight to federal decisions where they "are found to be logically persuasive and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees," . . . we are free to reject the conclusion of the U.S. Supreme Court so long as we remain faithful to the minimum guarantees established by the U.S. Constitution.

526 Pa. at 389–90, 586 A.2d at 894–95 (citation omitted). Even where the text of the provisions of the state and federal constitutions are similar or identical, we are not bound to interpret them as if they were mirror images. 526 Pa. at 391, 586 A.2d at 896.

■ "[A]s a general rule it is important that litigants brief and analyze at least the following four factors: 1) text of the Pennsylvania constitutional provision; 2) history of the provision, including Pennsylvania case-law; 3) related case-law from other states; 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." 526 Pa. at 374, 586 A.2d at 895.

The Superior Court did not address Franciscus's state constitutional claim. The court concluded that Franciscus had waived his claim by failing to include in his brief a detailed analysis of the four factors set forth in *Edmunds*. In *Commonwealth v. Hayes*, 544 Pa. 46, 674 A.2d 677 (1996), we noted that the four-pronged analysis is not mandatory. Thus, the Superior Court erred in dismissing Franciscus's state constitutional claim for failure to address the *Edmunds* factors at length.

We hold that Franciscus's right to counsel under Article I, Section 9 of the Pennsylvania Constitution was violated by the introduction of Krushinski's testimony. This decision rests firmly on independent state grounds. See *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Since the U.S. Supreme Court has not addressed the specific issue with which we are confronted, our analysis of Franciscus's federal constitutional claim reflects the policy considerations

that we perceive to be important. Thus, we would hold that the right to counsel guaranteed by the state constitution was violated in this case for the reasons previously articulated, even assuming that the U.S. Supreme Court should later decide that the Sixth Amendment is not violated under circumstances such as those presented in this case.

For these reasons, we reverse the order of the Superior Court and remand for a new trial.

CASTILLE, J., files a dissenting opinion in which NEWMAN, J., joins.

CASTILLE, Justice, dissenting.

I respectfully dissent to the majority's holding that the Commonwealth violated appellant's right to counsel under the Sixth Amendment to the United States Constitution and under Article I, Section 9 of the Pennsylvania Constitution. I believe that the majority's holding misconstrues federal precedent and is not warranted under Article I, Section 9. Further, I believe that the admission of the testimony in question was harmless error and that a new trial is unwarranted.

The majority concludes that there was an implicit understanding between the jailhouse informant and the Commonwealth even though police never gave Krushinski specific instructions or requested Krushinski to provide any information whatsoever. According to the majority, Krushinski had an incentive to continue seeking inculpatory statements from fellow inmates after the Commonwealth rewarded him for the receipt of unsolicited information in the past. The majority believes that Krushinski's subjective expectations of future rewards in exchange for unsolicited information effectuated a principal-agent relationship between the Commonwealth and Krushinski. This position finds no support in Sixth Amendment precedent. The majority's analysis under the Pennsylvania Constitution is predicated upon its Sixth Amendment analysis. However, today's holding is irreconcilable with cases construing the Sixth Amendment.

In *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the United States Supreme Court announced that the Sixth Amendment prohibits law enforcement officers from interrogating a defendant after his or her indictment and in the absence of counsel. In *Massiah,* police intercepted a conversation in which the indicted petitioner made inculpatory remarks to his co-defendant by installing a listening device in the parked car where the conversation took place after obtaining the co-defendant's permission. The Supreme Court upheld the trial court's suppression of the police officer's testimony relaying the conversation on the ground that the statements were obtained in violation of the petitioner's Sixth Amendment right to counsel.

The Supreme Court first considered the issue of inmate informants in *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In *Henry,* a government agent conducting a bank robbery investigation contacted an inmate who for some time had been providing confidential information to the Federal Bureau of Investigation as a paid informant. The informant was housed in the same cellblock as several federal prisoners awaiting trial, including Henry. The agent told the informant to be alert to any statements made by the prisoners, but not to initiate any conversation or question Henry regarding the bank robbery charges. The informant disregarded this instruction, questioned Henry, and then provided information to the government which helped convict Henry. The United States Supreme Court held that where an individual acts under instructions as a paid informant for the government, where he presents himself as no more than a fellow inmate rather than an agent of the government, and where the suspect is in custody and under indictment at the time of his questioning by the informant, the information secured by the informant must be suppressed. *Id.* at 270–71, 100 S.Ct. at 2186–87, 65 L.Ed.2d at 122. The Supreme Court reasoned that the agent's questioning, which was attributable to the government, secured information from the accused when counsel was not present in violation of the accused's Sixth Amendment right to counsel. *Id.*

In *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), an inmate who was incarcerated pending trial was placed in a cell with a prisoner who had previously agreed to act as a government informant. The State instructed the informant only to listen to the inmate's comments and not to ask any questions. The informant complied with this directive. The Court found that the informant in that case played the constitutionally permissible role of a mere "listening post." *Id.* 477 U.S. at 456 n. 19, 106 S.Ct. at 2628 n. 19. The Court held that this fact distinguished *Kuhlmann* from *Henry,* concluding that "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* at 459, 106 S.Ct. at 2630. Consequently, statements "deliberately elicited" by the government from a defendant after the right to counsel has attached and in the absence of a valid waiver are rendered inadmissible and cannot be used against the defendant at trial. *Massiah,* 377 U.S. at 206, 84 S.Ct. at 1203. However, incriminatory statements by a defendant will not be excluded merely because the statements are made after judicial proceedings have been initiated and in the absence of a valid waiver. Rather, law enforcement officials must actively engage in some conduct that infringes upon the defendant's Sixth Amendment right. *See Kuhlmann* at 459, 106 S.Ct. at 2630.

In *Henry,* the Court considered three factors in determining that the government had overstepped the bounds of the Sixth Amendment. First, the informant was acting under instructions as a paid informant for the government. Second, Henry was unaware that his confidant was in fact a government informant. Finally, Henry was in custody and under indictment at the time of the conversation; therefore, his incarceration imposed psychological pressures that rendered him "particularly susceptible to the ploys of undercover government agents." *Henry,* 447 U.S. at 274, 100 S.Ct. at 2189.

Here, Krushinski was not acting as an agent of the Commonwealth under the test set forth in *Henry.* Unlike the informant in *Henry,* Krushinski had not been promised any

consideration by the Commonwealth in exchange for information concerning appellant. The fact that appellant's youth and inexperience made him, in the eyes of the majority, more susceptible to Krushinski's claim of connections outside of the prison, is of no consequence because Krushinski was not an agent of the state. Appellant may have unwittingly fallen prey to Krushinski's selfish motives while incarcerated, but the same lapse could have happened outside the prison setting. Further, Krushinski was at Chester County Prison solely as an accommodation to Lancaster County authorities. The Commonwealth did not "plant" him in the prison or keep him there for the purpose of providing information.

Furthermore, the facts do not reveal the existence of an implied agreement between Krushinski and the Commonwealth. Although Krushinski was providing authorities with information concerning more than one criminal defendant, each time it was he who initiated the contact with police. The fact that police **subsequently** agreed to inform the Lancaster County Court of Common Pleas of his cooperation at the time of his sentencing did not retroactively create an agency relationship between the Commonwealth and Krushinski where no agreement occurred. Krushinski may have been gathering information for his own selfish purposes, but there was no negotiating process or bargaining between Krushinski and the Commonwealth wherein the Commonwealth agreed to provide continued incentives to Krushinski in exchange for more information.[1]

The Commonwealth was purely a passive beneficiary of a conversation initiated exclusively by Krushinski, with only Krushinski's expectation of any consideration. The majority believes that the Commonwealth should be stripped of these passively acquired fruits, apparently due to its belief that

1. The majority makes much of the fact that the police arranged for the depositing of funds into Krushinski's prison account. The police provided money to Krushinski in order to protect his safety. Krushinski had told other inmates, including one that he had informed on, that he had connections to the outside world. If it were to be revealed that his inmate account was devoid of funds, his facade would have been revealed and he would have been placed in danger. The administering of the funds was not conditional upon his continued cooperation.

appellant was unfairly outwitted by Krushinski. However, because the Commonwealth did not take any active steps to aid Krushinski in outwitting appellant, the Sixth Amendment simply is not implicated.

In *Commonwealth v. Moose*, 529 Pa. 218, 602 A.2d 1265 (1992), this Court confronted the question of whether the use of a jailhouse informant violated the Sixth Amendment rights of an inmate who was incarcerated pending trial. The informant had been kept in the county jail for three years pending sentencing because he was actively supplying the district attorney's office with information about various inmates. The Commonwealth repeatedly delayed sentencing every time the informant produced a new jailhouse admission. This Court determined that although the informant was not "planted" for purposes of gaining information from targeted defendants, he effectively became an agent of the state after being detained in the county jail for years for the purpose of collecting information. This Court reasoned that "the fact that the Commonwealth intentionally left him there to harvest information from anyone charged with a crime and awaiting trial [was] the villainy." *Id.* at 228, 602 A.2d at 1270.

I disagree with the majority's conclusion that *Moose* is controlling. In *Moose*, the prosecutor specifically agreed not to bring the informant up for sentencing as long as he was providing information. That informant was convicted of third-degree murder and was facing state prison time. Instead, he remained housed in county prison for three years as part of his arrangement with the prosecutor's office. Further, the Commonwealth in *Moose* was prepared to recommend a lenient sentence despite the serious nature of the informant's crimes. 529 Pa. at 229, 602 A.2d at 1270. Here, although the officers were prepared to *inform* the sentencing court of Krushinski's cooperation in prior, unrelated cases, there was no *agreement* that the Commonwealth would request leniency for Krushinski stemming from his cooperation in any case, including appellant's. Krushinski was incarcerated for theft by deception and impersonating a public servant. He was not likely to be sentenced to state prison, and his sentencing was not delayed as in *Moose*.

The majority's holding sets the precedent that if a jailhouse informant provides information to authorities on his own volition and the Commonwealth subsequently rewards him, the informant becomes an agent of the Commonwealth for purposes of all future encounters with fellow inmates. Thus, according to the majority's reasoning, the subjective hope or intent of one inmate, the informant, controls the determination of whether another inmate's Sixth Amendment rights have been violated. Yet the majority cannot cite to any authority from this Court or from the United States Supreme Court that would support such a contention. As the United States Supreme Court stated in *Kuhlmann*, "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached.... [A] defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." *Kuhlmann*, 477 U.S. at 459, 106 S.Ct. at 2629–30. Further, as the majority concedes, in the absence of a reward, there would be no incentive for informants to aid law enforcement agencies. Krushinski may have been hoping for future rewards and may have anticipated that his continued efforts would prove beneficial to him, but his subjective expectation is of no consequence absent an express agreement by which the state became an active partner for purposes of extracting information from appellant.

Appellant has not demonstrated, as he must under *Kuhlmann*, that the police and Krushinski took some action that was designed deliberately to elicit incriminating remarks. 477 U.S. at 459, 106 S.Ct. at 2629–30. Krushinski alone gathered all of the information in the instant matter prior to calling the authorities. He was not left in the prison specifically to continue his information gathering activities. Rather, he was transferred out of the prison the day after he volunteered to authorities the information concerning appellant. Appellant should not benefit by his misplaced confidence in Krushinski's perfidy.

This Court recently recognized that independent acts of inmates do not become imbued with the character of governmental action merely because they are later relied upon and used by the government in furtherance of governmental objectives. *Commonwealth v. Hawkins,* 549 Pa. 352, 701 A.2d 492 (1997). In *Hawkins,* this Court upheld the trial court's denial of the appellant's motion to suppress his inculpatory statements to two fellow inmates. This Court concluded that there was no violation of the appellant's Sixth Amendment right to counsel because neither informant was acting as an agent of the government. The record demonstrated that the two informants were acting on their own initiative without the benefit of any promise or reward by the Commonwealth in return for their cooperation. Further, police did not give either informant any information which would have enhanced their ability to solicit information from the appellant. Moreover, neither informant was intentionally placed in a cell near the appellant in order to aid in the investigation. 701 A.2d at 505.

Thus, under *Hawkins,* there is no Sixth Amendment violation where, as here, incriminating statements are made to a prison inmate who is acting on his own initiative, without promise of benefit from the Commonwealth, and who has been placed in a nearby cell by happenstance and not design. The majority concedes that no law enforcement agent ever gave Krushinski specific instructions or requested that he provide information regarding appellant. No officer of the Commonwealth ever discussed appellant with Krushinski prior to appellant's jailhouse confession. Further, nothing in the record reveals that the police provided Krushinski with any information concerning appellant's case which would have enhanced his ability to solicit information from appellant. Thus, Krushinski was not armed with any information that would have given him an unfair advantage over appellant. There is no evidence that the Commonwealth intentionally placed Krushinski in the cell adjacent to appellant's;[2] rather, he was moved

2. Many of the conversations between Krushinski and appellant took place in the dayroom of the cellblock, a common area used by all

to maximum security only after other inmates had discovered that he was an informant and assaulted him.

I am persuaded by the reasoning of *United States v. Hicks*, 798 F.2d 446 (11th Cir.1986), *cert. denied*, 479 U.S. 1035, 107 S.Ct. 886, 93 L.Ed.2d 839 (1987). In *Hicks*, the defendant had been arrested and advised of her right to counsel, and had requested an attorney. While in jail she confessed to another inmate, and later sought to have the statement suppressed on the ground that it was obtained in violation of her right to counsel. The 11th Circuit held that because the informant had not been instructed by law enforcement officials to gather information while in custody, no violation of the defendant's Sixth Amendment right to counsel had occurred. The fact that the informant had worked as a government informant on an unrelated matter did not render the informant an agent of the government for all purposes. *Id.; see also Commonwealth v. Rhoades*, 364 Pa.Super. 54, 527 A.2d 148 (1987), *appeal denied*, 521 Pa. 611, 557 A.2d 343 (1989) (not a violation of defendant's Sixth Amendment right to counsel where incriminating statements were made to a prison inmate who was acting on his own initiative and without promise of benefit from Commonwealth and who had been placed in adjoining cell by happenstance and not design).

In its haste to extend the Sixth Amendment to the facts of this case, the majority neglects to examine whether the underlying goals of the Sixth Amendment would be served by such an extension. The primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. *Kuhlmann*, 477 U.S. at 459, 106 S.Ct. at 2629, 91 L.Ed.2d. at 384. Here, there was no action taken by the Commonwealth to encourage Krushinski, a private citizen, to question appellant

inmates. Thus, the proximity of the cells is of minimal importance, as it appears the conversations would have taken place even if Krushinski's cell had been located further away from appellant's. The majority's position that the Commonwealth circumvented appellant's right to counsel by intentionally creating an opportunity to confront the accused without counsel being present is insupportable.

regarding his crime. Thus, the Sixth Amendment does not mandate the result reached by the majority.

Nor am I convinced that there has been a violation of appellant's right to counsel under Article 1, Section 9 of the Pennsylvania Constitution. While I do not necessarily agree with the majority that appellant's state constitutional claim was not waived by failing to include in his brief a detailed analysis of the four factors set forth in *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991), I nevertheless disagree with the result reached by the majority in its cursory analysis of appellant's claims under the Pennsylvania Constitution. Prior to the majority's decision herein, this Court had not yet addressed the appropriate level of constitutional protection afforded by Article 1, Section 9 of the Pennsylvania Constitution under the circumstances presented by the instant matter. Although the majority adopts the reasoning of federal precedent to support its conclusion that appellant's rights under Article 1, Section 9 were violated, for the reasons aforementioned, I believe that the majority has misconstrued federal precedent. Therefore, those cases do not provide persuasive authority to support the majority's conclusion. Further, I do not believe that it is necessary in this case to expand the right to counsel under the Pennsylvania Constitution beyond the level of protection afforded by the Sixth Amendment.

Article I, Section 9 provides:

Rights of accused in criminal prosecutions

In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land. The use of a suppressed voluntary admission or voluntary confession to impeach the credibility of a person

may be permitted and shall not be construed as compelling a person to give evidence against himself.

Here, there is no demonstrated need to extend protections under the Pennsylvania Constitution beyond those provided by the United States Constitution. As previously stated, Krushinski acted on his own volition without solicitation on the part of the government in eliciting inculpatory statements from appellant. Accordingly, there was no action on the part of the government that infringed appellant's rights under the Pennsylvania Constitution.

Other states have specifically declined to interpret their state constitutions to provide more protection than *Kuhlmann* and *Massiah* under the Sixth Amendment. *See Battenfield v. Oklahoma*, 816 P.2d 555, 562 (Okl.Crim.App.1991), *cert. denied*, 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992) (no violation of Oklahoma or United States Constitution where inmate awaiting trial initiated conversation and made inculpatory statements to uniformed state agent); *New Jersey v. Bey*, 258 N.J.Super. 451, 610 A.2d 403 (1992) (no violation of United States or New Jersey Constitution where inmate, on own volition, made inculpatory statements to corrections officer who was not acting under direction of state except for performing routine duties). The courts of Kentucky have declared that "the right to counsel guaranteed by Section 11 of the Kentucky Constitution[3] is no greater than the right of counsel guaranteed by the Sixth Amendment of the United

**3.** Section 11 of the Kentucky Constitution provides:

RIGHTS OF ACCUSED IN CRIMINAL PROSECUTION; CHANGE OF VENUE

In all criminal prosecutions the accused has the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor. He cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land; and in prosecutions by indictment or information, he shall have a speedy public trial by an impartial jury of the vicinage; but the General Assembly may provide by a general law for a change of venue in such prosecutions for both the defendant and the Commonwealth, the change to be made to the most convenient county in which a fair trial can be obtained.

States.... " *Cane v. Kentucky,* 556 S.W.2d 902, 906 (Ky.Ct. App.1977) *cert. denied,* 437 U.S. 906, 98 S.Ct. 3094, 57 L.Ed.2d 1136 (1978).[4] Thus, this Court should not expand the right to counsel under the Pennsylvania Constitution to include greater protections than those afforded by the Sixth Amendment in this instance.

Finally, even if appellant's right to counsel under either constitution was violated, a new trial is not warranted because the admission of Krushinski's testimony was harmless error. Appellant confessed his crime to two other persons in addition to Krushinski. Appellant admitted to his friend, Jason Reuben Armstrong, that he murdered the victim and showed Armstrong where the body was located. Appellant also called his girlfriend, Dana Kind, and told her that he had killed someone, the location of the murder, and his fear that he had dropped his eyeglasses and lighter somewhere near the scene of the crime.[5] N.T. at 1182. Thus, the testimony of Krushinski merely corroborated the testimony of the other witnesses to whom appellant had confessed. Accordingly, no new trial is warranted.

NEWMAN, J., joins this dissenting opinion.

---

4. The interpretation of the Kentucky Constitution is especially persuasive because that document was modeled after the Pennsylvania Constitution. *See Kentucky v. Wasson,* 842 S.W.2d 487, 498 (noting that cases interpreting the Pennsylvania Constitution are "uniquely persuasive" in construing the Kentucky Constitution because of the common heritage shared by the Kentucky Bill of Rights of 1792 and the Pennsylvania Bill of Rights of 1790).

5. A broken pair of eyeglasses, which appellant later admitted were his, were found near the body. Defendant's mother and optician also verified that the glasses were his.