J-S05013-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DA RAN MALIK SEARS, | |
| Appellant | No. 1738 MDA 2015 |

Appeal from the Judgment of Sentence Entered August 17, 2015
In the Court of Common Pleas of Lycoming County
Criminal Division at No(s):
CP-41-CR-0000293-2014
CP-41-CR-0001293-2013

BEFORE:  BENDER, P.J.E., PANELLA, J., and PLATT, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED FEBRUARY 14, 2017**

Appellant, Da Ran Malik Sears, appeals from the judgment of sentence of an aggregate term of 21 to 50 years' incarceration, imposed after he was convicted, following a non-jury trial, of various offenses, including third-degree murder.  On appeal, Appellant challenges the sufficiency of the evidence to sustain his murder conviction, the trial court's denial of his motion to suppress statements he made to another inmate, and the discretionary aspects of his sentence.  After careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

We have reviewed the certified record, Appellant's brief,[1] and the applicable law. Additionally, we have reviewed the thorough opinion of the Honorable Marc F. Lovecchio of the Court of Common Pleas of Lycoming County. We conclude that Judge Lovecchio's extensive, well-reasoned opinion accurately disposes of the issues presented by Appellant. Accordingly, we adopt his opinion as our own and affirm Appellant's judgment of sentence on grounds set forth therein.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/2017

---

[1] The Commonwealth has not filed a brief in this case.

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH | : No. CR-1293-2013 |
| | :     CR-293-2014 |
| | : |
| vs. | : CRIMINAL DIVISION |
| | : |
| | : |
| DA' RAN SEARS, | : |
| Appellant | : 1925(a) Opinion |

## OPINION IN SUPPORT OF ORDER IN
## COMPLIANCE WITH RULE 1925(a) OF
## THE RULES OF APPELLATE PROCEDURE

This opinion is written in support of this court's judgment of sentence dated

August 17, 2015, which became final after the court denied Appellant's post sentence motion

in an opinion and order dated October 2, 2015. The relevant facts follow.

On June 13, 2013, Appellant shot and killed Donte Marks. The police initially

charged Appellant with involuntary manslaughter, receiving stolen property, simple assault

(bodily injury with a deadly weapon), and recklessly endangering another person under

information 1293-2013. After further investigation, the police charged Appellant with third

degree murder under information 293-2014 arising out of the same incident. The charges in

both cases were consolidated for trial.

Appellant waived his right to a jury trial. A bench trial was held March 2-3,

2015. The court found Appellant guilty of all of the charges. On August 17, 2015, the court

imposed an aggregate sentence of twenty-one (21) to fifty (50) years of incarceration in a



1

state correctional institution.

Appellant filed a post sentence motion, which the court denied in an opinion and order dated October 2, 2015.

Appellant filed a notice of appeal. In his concise statement, he asserted the following issues: (1) the evidence presented at trial was insufficient to prove malice for third degree murder; (2) the trial court erred in denying his motion to suppress statements to a jailhouse informant; and (3) the sentence imposed was manifestly excessive and the trial court abused its discretion when imposing the sentence as specified in his motion to reconsider sentence and at the hearing on the motion.

Appellant first asserts that the evidence presented at trial was insufficient to prove malice for third degree murder. The court cannot agree.

> In reviewing the sufficiency of the evidence, [the court] must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Further, the trier of fact is free to believe all, part, or none of the evidence.

*Commonwealth v. Woodward*, 129 A.3d 480, 489-90 (Pa. 2015).

To establish third degree murder, the Commonwealth must prove malice. *Commonwealth v. Fisher*, 622 Pa. 366, 375, 80 A.3d 1186, 1191 (2013); *Commonwealth v. Morris*, 958 A.2d 569, 576 (Pa. Super. 2008), appeal denied, 605 Pa. 711, 991 A.2d 311 (2010). Malice is not just ill-will, but also a wickedness of disposition, hardness of heart, recklessness of consequences and a mind regardless of social duty. *Fisher, Id.* Malice may

2

be inferred from the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Houser*, 610 Pa. 264, 273, 18 A.3d 1128, 1134 (2011); *Commonwealth v. Briggs*, 608 Pa. 430, 456, 12 A.3d 291, 306-307 (2011); *Commonwealth v. Garland*, 63 A.3d 339, 345 (Pa. Super. 2013)(citations omitted).

The Commonwealth's theory in this case was that the victim was teasing Appellant about holding a firearm while watching a cartoon. Appellant felt that he was being disrespected, got angry, stood up and shot the victim in the neck. The evidence presented at trial supported this theory.

Although Appellant claimed that the shooting was "accidental," the evidence overwhelmingly established that Appellant pointed a gun at the victim and pulled the trigger not knowing if the gun was loaded.

The physical evidence was consistent with Appellant handling the gun, pointing the gun at the victim, and pulling the trigger when he was within only a few feet of the victim.

One witness heard arguing, with words to the effect of "I am going to fucking kill you" or "you motherfucker I am going to kill you" and then within seconds heard a bang and a big thump like someone fell on the ground. N.T., March 2, 2015, at 31-32, 46-47.

Another witness saw Appellant sitting with a gun in his lap while he was watching Phineas and Ferb. The witness heard the victim tell Appellant, "It don't even look right you watching Phineas and Ferb with a gun on your leg." Shortly thereafter, the victim was shot and he fell to the floor. Appellant told the witness to hide the gun. N.T., March 3, 2015, at 69, 85-87.

3

Still another witness testified that while incarcerated together, Appellant told him about the shooting. Appellant said he was playing with his .22 while watching Phineas and Ferb. The victim came in and was disrespecting him by calling him a "little ass boy" and saying he couldn't be watching Phineas and Ferb and be holding a gun. Appellant got angry, pointed the gun at the victim and said "I'll show you who's a little ass boy" and pulled the trigger. N.T., March 3, 2015, at 34-36.

Perhaps most telling, however, were Appellant's admissions to law enforcement. Appellant was interviewed on June 13, 2013, the day of the shooting. The interview was both video and audio taped. The tape was played during the trial.

Appellant conceded that the words between him and the victim might be "misconstrued" as "they was arguing." Transcript of Appellant's Interview, at 28. He admitted to holding the gun in his hand. *Id.* at 29. He also admitted that while holding it in his hand "it went off and Donte got hit." *Id.* at 34. Furthermore, he was "pretty sure" that he pointed the gun at Donte. *Id.* at 36. He could not remember if the clip was in the gun or if it was loaded. *Id.* at 35-36.

He indicated that he did not remember pulling the trigger because "it happened so fast" but conceded that he "had to squeeze the trigger…there ain't no other way… ." *Id.* at 56, 60. When asked whether the gun went off because he squeezed the trigger, he answered "had to." *Id.* at 61.

To corroborate Appellant's statement that he had to pull the trigger, the Commonwealth presented evidence that the weapon could not discharge without the trigger being pulled. Specifically, the Commonwealth conducted a "trigger pull" test and a "shock

4

and drop" test, both of which confirmed that the gun could not discharge without the trigger being pulled. N.T., March 2, 2015, at 109-110, 113, 118.

Even if the evidence is viewed in a light most favorable to Appellant, it would demonstrate that he pointed the gun and pulled the trigger without knowing whether the gun was loaded.

Under Pennsylvania law, if an individual points a gun at another individual not knowing for certain whether the gun is loaded, that individual "exhibits that type of cruel and wanton conduct which legal malice is made." *Commonwealth v. Seibert*, 424 Pa. Super. 242, 622 A.2d 361, 366 (1993)(citing *Commonwealth v. Young*, 494 Pa. 224, 431 A.2d 230, 232 (1981)).

As the Pennsylvania Supreme Court specifically noted in *Young*:

> Appellant intentionally pointed a loaded gun at the victim and shot him in the chest. Under these circumstances, whether the gun discharged accidentally or was fired intentionally is irrelevant for the purpose of determining the existence of malice. Even if, as appellant claims, he did not know that the gun was loaded and intended only to "scare" the victim, his conduct nevertheless unjustifiably created an extremely high degree of risk, thereby evincing a wanton and reckless disregard for human life. By intentionally aiming a gun at [the victim] without knowing for a certainty that it was not loaded, appellant exhibited the type of cruel and wanton conduct of which legal malice is made.

*Young*, supra. For the foregoing reasons, the evidence was clearly sufficient to establish malice.

Appellant next contends that the trial court erred in denying his motion to suppress statements to a jailhouse informant. Again, the court cannot agree.

Appellant asserted that the statements were made in violation of his Sixth

5

Amendment right to counsel because the jailhouse informant, Gage Wood, was acting on behalf of law enforcement.

On November 26, 2012, Wood was arrested for drug offenses that allegedly occurred in July 2012 and he was interviewed by Sergeant Chris Kriner of the Old Lycoming Police Department. N.T., January 16, 2015 ("Suppression Hearing"), at 40, 52. Sgt. Kriner spoke to Wood about a drug investigation and some of the people involved. Suppression Hearing, at 28. Sgt. Kriner did not recall asking Wood for cooperation or saying there would be any benefit. Suppression Hearing, at 29. Sgt. Kriner specifically inquired about individuals named Mancini and Matthews. Suppression Hearing, at 29. Wood spoke about some individuals involved in drugs, but when Sgt. Kriner asked Wood about the offenses for which he had been arrested, Wood did not want to talk anymore and asked to be taken to jail. Suppression Hearing, at 29-30, 43.

A couple of days later, Officer Deremer from Jersey Shore arrested Wood. Officer Deremer, however, did not interview Wood. Suppression Hearing, at 55.

Wood was represented by Attorney Robert Hoffa. Suppression Hearing, at 56, 75. Attorney Hoffa filed a suppression motion, which was scheduled to be heard on April 29, 2013. Suppression Hearing, at 3, 16, 56. Shortly before the hearing date, Wood expressed to Attorney Hoffa an interest in cooperating with the Commonwealth. Suppression Hearing, at 5, 56. On April 26, 2013, Attorney Hoffa met with District Attorney Eric Linhardt. Suppression Hearing, at 18. Attorney Hoffa told DA Linhardt that Wood had a substantial number of names of people who were involved in drug and firearm offenses and he was interested in cooperating. Suppression Hearing, at 21, 56. D.A. Linhardt wanted to know

6

what Wood knew about an individual named Hyson Frederick because D.A. Linhardt had information that Wood provided Frederick with a weapon that Frederick used in a robbery case. Suppression Hearing, at 9-11, 24-25, 57-58, 76. Wood's suppression hearing was continued because of the potential plea negotiations. Suppression Hearing, at 10, 57. Attorney Hoffa visited Wood at the prison and asked if he knew anything about Frederick. Suppression Hearing, at 10. Wood denied knowing anything about selling a gun to or getting a gun for Frederick. Suppression Hearing, at 10-11, 58, 77. Attorney Hoffa called DA Linhardt and told him that. Suppression Hearing, at 14.

On May 10, 2013, the pretrial conference in Wood's case was continued because Attorney Hoffa was in federal court. Suppression Hearing, at 13. On May 20, 2013, Wood wrote a letter to Hoffa asking if there was any news on his cases after the pre-trial conference. Suppression Hearing, at 12-13. According to Attorney Hoffa, Wood kept vacillating between wanting to pursue the motion to suppress and wanting to cooperate with the D.A. Suppression Hearing, at 15. In the post script to that letter, Wood wrote, "I'm very curious as to why the D.A. thought I was connected to Hyson Frederick!? I am now on a block with him." Suppression Hearing, at 26, 77. He also thought of more names and enclosed a list of them. Suppression Hearing, at 6. When Attorney Hoffa read the list, he realized that he and the other attorneys at his law firm represented some of the individuals on Wood's list. Suppression Hearing, at 7.

On June 13, 2013, Appellant was arrested and charged with involuntary manslaughter. Suppression Hearing, at 91. Between June 14 and July 1, 2013 Appellant and Woods had conversations at the prison. Suppression Hearing, at 66-67, 85. Although they

7

may have had conversations after that date, Wood stated he did not learn anything new after that time frame. Suppression Hearing, at 72, 85.

A status conference was held in Woods cases on June 28, 2013. Before that conference, Wood quit vacillating and decided to cooperate. Attorney Hoffa spoke to DA Linhardt outside the judge's chambers about Woods decision to cooperate. At the conference, Attorney Hoffa raised the conflict of interest issue and he was permitted to withdraw as Wood's attorney. Suppression Hearing, at 20, 58-59.

On July 30, 2013, Wood was arrested for a burglary that occurred in September 2012. Suppression Hearing, at 40, 42. Sgt. Kriner was the affiant, but he did not talk to Wood. Suppression Hearing, at 42.

On August 17, 2013, Wood wrote a letter to DA Linhardt. Suppression Hearing, at 31, 64; Commonwealth's Exhibit 1. Wood offered to provide information about individuals who were involved in drug and firearm offenses, as well as cooperate against about a dozen individuals he met at the prison and who admitted guilt and details about their cases to him. Suppression Hearing, at 65. In exchange for this information, Wood wanted his girlfriend's, his brother's and his charges dismissed or reduced to misdemeanors with a sentence of time served or probation. Commonwealth's Exhibit 1.

In October 2013, County Detective Stephen Sorage and Sgt. Kriner interviewed Wood. Suppression Hearing, at 33, 67-68. Detective Sorage had information that Wood provided a weapon to Frederick, which was used in a robbery. Suppression Hearing, at 88-89. Wood denied providing any weapon to Frederick or even knowing him until they met in prison. Suppression Hearing, at 33-34, 68.

On November 18, 2013, Sgt. Kriner and Cpl. Sponhouse met with Wood and his attorney John Gummo about Wood's offer to cooperate. Suppression Hearing, at 35-36, 46-47, 70. This interview was recorded and Sgt. Kriner prepared a police report. Suppression Hearing, at 44-45, 47. Sgt. Kriner again asked Wood about an individual named Mancini. Suppression Hearing, at 36. Wood also had notes about other individuals. Some of the individuals were people who Wood had met at the county prison. Suppression Hearing, at 45. Sgt. Kriner described the interview as "more of a proffer meeting."Suppression Hearing, at 46. The purpose of the meeting was to see what kind of information Wood could provide and to see if the information was reliable. Suppression Hearing, at 46, 48. They discussed information that Wood already had. Suppression Hearing, at 48. Sgt. Kriner was not interested in using Wood as an informant because he knew Wood was going to jail. Suppression Hearing, at 49. Sgt. Kriner told Wood he would let other police agencies know about the information Wood was providing. Suppression Hearing, at 45, 71. Sgt. Kriner, though, did not recall telling Wood that that it would help his cases. Suppression Hearing, at 45, 54.

Wood provided information about Appellant and other homicides in the city. Suppression Hearing, at 38, 71. Wood talked about the people on his list. Suppression Hearing, at 36. Sgt. Kriner asked who they were and what their involvement was. Suppression Hearing, at 36. Sgt. Kriner did not recall whether they went down the list or if Wood brought it up. He also did not recall Wood saying when he got the information that he was providing.

After the November 18, 2013 interview, Sgt. Kriner spoke to the Williamsport

9

Bureau of Police, the Pennsylvania State Police and the South Williamsport Police Department about the information Wood provided. Suppression Hearing, at 37.

On January 16, 2014, Agent Trent Peacock of the Williamsport Bureau of Police interviewed Wood. Suppression Hearing, at 87. Wood told Agent Peacock about the information he had about Appellant. Wood stated that the information was from before July 1, 2013 and it "was the same gist of things" that he told Sgt. Kriner in November; there was nothing new. When he provided the information about Appellant to the DA, it was pretty much the end of his discussions with Appellant. Suppression Hearing, at 72.

Wood testified that he contacted the District Attorney and initiated everything. Suppression Hearing, at 63-66. Neither the District Attorney nor the police told Wood to obtain information from other inmates at the prison. Suppression Hearing, at 67.

Appellant's counsel, relying on *Commonwealth v. Franciscus*, 710 A.2d 1112 (Pa. 1998), contended that Appellant's statements to Wood had to be suppressed because Wood was acting as an agent of the Commonwealth and law enforcement when he spoke to Appellant in the prison. The Commonwealth asserted that Wood obtained the information on his own and then informed the Commonwealth to try and help his own situation.

*Franciscus* is distinguishable. In *Franciscus*, the police continually communicated with the informant throughout his stay in prison. They protected the informant from retaliation and encouraged him to obtain whatever useful information he could.

Instead, this case was more akin to *Commonwealth v. Lopez*, 739 A.2d 485

10

(Pa. 1999) in which the Court affirmed the lower court's denial of the motion to suppress because the authorities made no promises to the informant and took no action to assist him in obtaining incriminating information from the defendant or any other inmates.

Here, like the informant in *Lopez*, Wood decided on his own to attempt to obtain incriminating information from other inmates and then try to use it to obtain a lesser sentence. When he spoke to Appellant, he was not doing so at the request or direction of the police or the DA; he was acting on his own in an effort to avoid going to state prison. Under these circumstances, Wood was not acting as an agent of law enforcement. Therefore, Appellant's Sixth Amendment right to counsel was not violated and the statements were not subject to suppression.

Appellant's final contention is that the trial court abused its discretion and imposed an unduly harsh and manifestly excessive sentence in light of his poor upbringing, his young age, his extreme remorse, and the alleged accidental nature of this incident.

"Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed…absent a manifest abuse of discretion." *Commonwealth v. Bricker*, 41 A.3d 872, 875 (Pa. Super. 2012) (quoting *Commonwealth v. Cunningham*, 805 A.2d 566, 575 (Pa. Super. 2002). "[A]n abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless 'the record disclosed that the judgement exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.'" *Commonwealth v. Walls*, 592 Pa. 557, 926 A.2d 957, 961 (2007)(quoting *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893, 895 (1996)).

When imposing a sentence, the sentencing court must consider the protection

of the public, gravity of offense in relation to the impact on the victim and community, and the rehabilitative needs of the defendant. *Commonwealth v. Fullin*, 892 A.2d 843, 847 (Pa. Super. 2006). The court is also guided by section 9781 (d) of the Judicial Code, which requires appellate courts in reviewing a sentence to determine from the record whether the court considered: "(1) The nature and circumstances of the offense and the history and characteristics of the defendant; (2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation; (3) The findings upon which the sentence was based; and (4) The guidelines promulgated by the commission." 42 PA. CONS. STAT. ANN. §9781(d).

The standard guideline range for third degree murder with a prior record score of zero and an offense gravity score of fourteen was 72 months (or six years) to the statutory limit, which is 20 years. Transcript, August, 17, 2015 ("Sentencing Transcript"), at 18-19. The standard guideline range for receiving stolen property with a prior record score of zero and an offense gravity score of eight was 9-16 months. Sentencing Transcript, 19.The court imposed a standard guideline sentence.

The court ordered, received, and reviewed an extensive pre-sentence investigation report. At the time of sentencing, Appellant was 20 years old and had obtained his GED. He had been incarcerated since June 13, 2013. Sentencing Transcript, at 8.

Unfortunately, through February of 2015, Appellant's incarceration was replete with write-ups and sanctions. From July 11, 2013 through February 11, 2015, he received seven write-ups, three of which related to fighting and one of which related to refusing orders. As a result of his write-ups, he received a total of 115 days of disciplinary

12

lock-up. In addition, he received 28 warnings on other occasions from correctional staff. Just one month into his incarceration, he was removed from the AA Program for not attending. Subsequent to that, he attended no treatment programs whatsoever. Sentencing Transcript, at 11.

Appellant's version of the event fairly mirrored his statement to police. He indicated that he and the victim were talking. He had the gun in his hand and the victim told him he was crazy for holding a gun and watching cartoons at the same time. According to Appellant, "the last thing" he remembered is that they were talking about girls. He did not remember pulling the trigger. "It all seemed to happen so fast." Sentencing Transcript, at 7-8.

The Commonwealth's version of the incident, however, which was supported by the evidence at trial, was that Appellant shot the victim because he was teasing him about playing with or holding a gun while he was watching cartoons, which led to an argument. The gun did not accidentally discharge; instead, Appellant pulled the trigger.

Appellant had a long history of juvenile offenses which "were of a violent nature and often involved other students, teacher's aides, or teachers being physically assaulted." During sentencing, the court approximated that Appellant was involved in these various juvenile offenses at the ages of 9, 10, 11, 12, and 13. These offenses, however, did not count in Appellant's prior record score because they were deferred adjudications or consent decrees for offenses which occurred before his fourteenth birthday. He was 18 years old at the time of the present offense. Sentencing Transcript, at 8-10.

When he was approximately seven years old, Appellant was placed in foster

13

care due to his mother's addiction to controlled substances and her inability to handle his "aggressive behaviors." During his "school years" he worked with a therapeutic support specialist, along with a behavioral specialist. Sentencing Transcript, at 9.

A significant concern of the reporting officer was that Appellant exhibited a pattern of behavior over several years involving assaults and that with respect to this particular incident, Appellant had little if any remorse or regret. Sentencing Transcript, at 10.

At sentencing, the court also reviewed a comprehensive behavioral health evaluation prepared by Dr. Denise Feger of Crossroads Counseling, Inc. Sentencing Transcript, at 12-18.

Dr. Feger was retained by defense counsel to complete "an objective assessment regarding Mr. Sears' level of remorse." Dr. Feger outlined Appellant's tragic childhood. Considering his childhood, as well as the lack of therapeutic intervention and progress in the past, Dr. Feger concluded that Appellant "has not even begun to complete any work regarding emotional improvement as a result of the trauma he was exposed to as a child." Importantly, she noted that "this has resulted in a young man who is impulsive, aggressive and hostile, shows little investment in others, isn't trusting of others and tends to lack awareness of how his past has impacted his current circumstances." She noted that Appellant has little trust in the "system" and will likely make very slow progress. She suggested that "sentencing should be considered with a more significant supervision requirement as this will allow for follow through and requiring such."

Dr. Feger concluded that there are significant underlying factors that have impacted Appellant's ability to make appropriate decisions. Appellant struggles to "connect,

14

bond, feel empathy, and express emotion appropriately." She set forth diagnoses of reactive attachment disorder, conduct disorder, and oppositional defiant disorder. She noted that "considering his placements in group homes and foster homes, an absent relationship with his father, and his mother's challenges in remaining sober to care for him and his siblings adequately, this is not uncommon to meet criteria for the above-mentioned" diagnoses.

The court also had an opportunity to question Dr. Feger. Sentencing Transcript, at 20-26.

Dr. Feger confirmed her conclusions and observations as set forth in the report. She noted that Appellant did, in fact, feel remorse over the killing of his friend. She noted, unfortunately, that without significant intervention, given Appellant's history, symptomology and lack of treatment, Appellant might continue to engage in criminal, aggressive or even assaultive behaviors as a means to survive his environment. Furthermore, and perhaps more unfortunately, she noted that Appellant was not likely to get the necessary therapeutic intervention until he was released from prison.

Admittedly, the court struggled with determining an appropriate sentence for Appellant. Sentencing Transcript, at 48-57. The court considered Appellant's young age and poor upbringing. Regardless, at this point, Appellant is who he is. Sentencing Transcript, at 23. The court could not, in good conscience, mitigate Appellant's sentence because of why Appellant turned out to be an impulsive, aggressive, hostile, untrusting and unaware young man.

The circumstances of the offense were dreadful and appalling. Out of anger and impulse, Appellant pointed a gun at his apparent best friend and pulled the trigger. The

15

court did not find credible Appellant's excuse that it was purely an accident and that he had no idea what was happening. Rather, the court found credible the statements of the witnesses regarding Appellant's expressions of anger. Simply put, Appellant could not control himself and, because he was being made fun of, he shot and killed his best friend. Appellant is clearly a danger to the public. He has been a danger since he was approximately 10 years old. He was in possession of a stolen firearm, playing with it while watching cartoons and then, with only the slightest of provocation, he shot and killed a young man. Incarceration for a lengthy period of time is not only advisable, but essential. The court needed to protect society from someone who, when he believes he is being disrespected, shoots or assaults other individuals. See Sentencing Transcript, at 15, 22-23.

The impact on the victim, his family members and the community was remarkable. A young man with a bright future was taken forever from his family and friends. Society lost a potentially valuable contributing member. The public's right and expectation of a safe community was again shattered by inexplicable gun violence. Sentencing Transcript, at 52.

The court acknowledged Appellant's young age, his tragic upbringing and the lack of therapeutic intervention to help him with his problems. The court also acknowledged that Appellant expressed some remorse to Dr. Feger and, perhaps soon after the shooting occurred, realized the impact of his actions. The court acknowledged that while in jail Appellant eventually conformed his behavior to that as expected, but only after a series of misconducts. The court acknowledged that with supports in place Appellant fared better.

Still, Appellant is extremely dangerous. Sentencing Transcript, at 54-55. It

16

would be naïve and unreasonable for the court to expect Appellant to control his anger and treat a stranger or the public better than a person who Appellant frequently referred to as "his brother." The court cannot take the risk of Appellant being released earlier than 21 years, especially in light of the fact that he may very well not get appropriate treatment while incarcerated or afterwards. Unfortunately, we live in a society that has provided less mental health care and less therapeutic services for those with similar problems as Appellant. In fact, given Appellant's aggressive and violent tendencies and the lack of medications and/or diminishing treatment resources available for individuals like Appellant who suffer from personality disorders, the court concluded that the only appropriate place for Appellant was in a state prison. Sentencing Transcript, at 55.

DATE: ___5-6-2016___          By The Court,


Marc F. Lovecchio, Judge


cc:   Kenneth Osokow, Esquire (ADA)
      Nicole Spring, Esquire (APD)
      Work file
      Gary Weber, Esquire (Lycoming Reporter)
      Superior Court (original & 1)

17