J-S26018-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JUSTIN SCHUBACK | : | |
| | : | |
| Appellant | : | No. 1836 MDA 2024 |

Appeal from the Judgment of Sentence Entered July 10, 2024
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s):  CP-35-CR-0001218-2023

BEFORE:  LAZARUS, P.J., OLSON, J., and BECK, J.

MEMORANDUM BY OLSON, J.:                    **FILED: OCTOBER 20, 2025**

Appellant, Justin Schuback, appeals from the July 10, 2024 judgment of sentence entered in the Court of Common Pleas of Lackawanna County after a jury convicted Appellant of murder of the first degree, robbery – infliction of serious bodily injury, and burglary – overnight accommodation.[1]  As discussed in greater detail *infra*, the trial court sentenced Appellant to life imprisonment, to be followed by an aggregate term of 7½ to 15 years' incarceration.  We affirm.

The trial court summarized the factual circumstances which led to Appellant's convictions as follows:

> This homicide prosecution arises from the death of Robert Scott Baron ("Baron"), who was reported missing on January 26, 2017, and whose skeletal remains were discovered more than six years

---

[1] 18 Pa.C.S.A. §§ 2502(a), 3701(a)(1)(i), and 3502(a)(1)(i), respectively.

later on March 28, 2023. On January 26, 2017, Baron's wife, Maria Baron, [("Mrs. Baron")] informed the Old Forge Police Department that Baron [] failed to pick up his son, Robert Alfred Baron ("Robert Jr."), [on January 26, 2017,] for work at Baron's business, Ghigiarelli's Restaurant. Robert Jr. advised the police that his father's 2006 silver Hyundai Elantra was not parked at the restaurant, that the early morning delivery of pizza dough was left on the sidewalk, and that Baron was not present in the restaurant. [Mrs.] Baron reported that Baron ate dinner with her at their residence on January 25, 2017, and left [the residence] at approximately 9:30 p.m. to return to Ghigiarelli's Restaurant[,] which had an upstairs apartment where Baron "stayed at during the nighttime." Baron [was last] seen by his family when he drove [Robert] Jr. home between 10:30 p.m. and 11:00 p.m. on January 25, 2017, before Baron returned to the restaurant in his Hyundai vehicle.

The Old Forge Police Department obtained a search warrant to access Ghigiarelli's Restaurant on January 26, 2017, and upon observing visible evidence of an apparent crime, contacted the Pennsylvania State Police [("PSP")] Forensic Services Unit to process the crime scene. The evidence discovered by the [PSP] included spattered blood, broken glass, a human tooth in the utility sink, cash missing from the register, an empty safe, and swiping and wiping patterns indicating efforts to clean the [crime] scene. The [PSP] treated the restaurant waiting area and bar [area] with Luminol to determine if certain items or areas [illuminated with a blue glow] and revealed additional blood evidence, and also collected samples of the spattered blood for testing.[2]

When the police interviewed Robert Jr. on the morning of January 26, 2017, he "indicated that [Appellant] might have something to do with his father's disappearance" since Robert Jr. was angry with [Appellant] for failing to purchase drugs with money that Robert Jr. [] provided him for that purpose. Upon interviewing [Appellant] on January 26, 2017, the police learned that [Appellant] and Robert Jr. were friends and fellow drug users, that [Appellant] knew from Robert Jr. that Baron kept large sums of

---

[2] "Luminol" is "a chemical that illuminates when it contacts the iron component of blood." *Commonwealth v. Williams*, 854 A.2d 440, 443 (Pa. 2004), *cert. denied*, 546 U.S. 829 (2005).

cash at Ghigiarelli's Restaurant, and that Robert Jr.[, on occasion,] would leave an upstairs window unlocked and use a nearby ladder to enter the locked restaurant at night in order to steal money to purchase drugs. The preliminary investigation also revealed that [Appellant's] drug dealer, Patrick Boyle, [("Boyle")] was actively "threatening to beat up" [Appellant] for money that [Appellant] owed him, and that [Appellant] advised [Boyle] on the afternoon of January 25, 2017, that "I'll be down to see you later with the money, I have some work to do."

[Appellant's] live-in girlfriend, Kourtney Rake, [("Rake")] informed the police that [Appellant] left their residence [located on] Foundry Street[ in] Old Forge, [Pennsylvania] between 9:00 p.m. and 10:00 p.m.[,] on January 25, 2017, after informing her that he was meeting [Boyle] "to work on a car and potentially pick up drugs." At 12:25 a.m.[,] on January 26, 2017, [Appellant] met [Boyle] near a [retail] store and paid him the $60.00 that [Appellant] owed him[. D]espite the fact that [Appellant] was unemployed, he gave [Boyle] an additional $180.00 to purchase 11 bags of heroin.[FN1] After [Appellant] initially failed to answer [Rake's] telephone calls and text messages inquiring about his whereabouts, [Appellant] transmitted a text message to her at 1:27 a.m.[,] on January 26, 2017, stating "shhhh, I'll explain when I get there."

> [Footnote 1: Boyle] advised the police that although [Appellant] typically arrived from the direction of his Foundry Street residence when he purchased drugs from [Boyle] at the [designated] location, [Appellant,] instead, approached from the direction of Ghigiarelli's Restaurant at the time of their drug transaction on January 26, 2017, at 12:25 a.m.

[Rake] told the [] police that [Appellant] eventually returned home and entered their residence *via* his bedroom window at approximately 3:00 a.m.[,] on January 26, 2017. At that time, she noted that [Appellant] "was sweaty and his clothes were muddy" and that "he seemed out of breath." When she asked [Appellant] where he had been, he replied "that he saw police" and "was hiding from them because he had drugs on him" and believed "that they were actually following him." [Rake and Appellant] "took the drugs after he got cleaned up" and "then went to bed."

In light of the preliminary information gathered from Robert Jr. and [Appellant], Detective Sheryl Turner of the Lackawanna County District Attorney's Office forwarded a letter to Verizon Wireless on January 26, 2017, requesting that it preserve and retain specific data pertaining to [Appellant's cellular telephone], such as [text-based short messages service] messages, call logs, [multimedia messaging service messages containing pictures or videos], browsing history, and [internet protocol] logs, for the period from January 21, 2017, to January 26, 2017, but she did not demand or receive any such information at that time.

[] Kevin Snyder, [("Snyder") whose residence is located on Connell Street in Old Forge] informed the police that on January 26, 2017, at 6:45 a.m., he observed a 2006 silver Hyundai Elantra parked at the "dead end" of that street. However, when his wife[] "went out to walk her dogs" at 9:00 a.m.[,] on January 26, 2017, "the vehicle was gone." Additionally, [Appellant's] cousin, Jason Cistola, [("Cistola")] advised the police that he sold heroin to [Appellant] for $300.00 on January 26, 2017, and for $150.00 on January 28, 2017, even though [Appellant] was not gainfully employed.

On January 29, 2017, Baron's Hyundai Elantra was discovered at [a location on] Howard Street in] Old Forge. Blood stains were observed in the interior of the vehicle, including the steering wheel and the interior door handle on the driver's side. The vehicle was [examined by] the PSP Forensic Services Unit, which swabbed the various blood stains to retrieve samples for [deoxyribonucleic acid ("DNA")] testing.

On March 22, 2017, the forensic DNA scientists with the PSP laboratory issued a report concluding that the DNA retrieved from the tooth found in the [utility] sink at Ghigiarelli's Restaurant, the blood located in [the] bar and restaurant area[s], the blood in the Hyundai vehicle, and the blood on the [blanket] found in the restaurant matched the DNA profile derived from Baron's toothbrushes. The DNA extracted from the Hyundai's steering wheel contained "a DNA mixture profile" indicating "that more than one person's DNA [was] present," and that Baron's DNA "could not be excluded as a contributor to this profile." In their supplemental report[,] dated September 12, 2017, [the forensic DNA] scientists reported that the DNA obtained from a napkin and newspaper found in the Hyundai [vehicle] and from the interior door frame [on the front passenger's side of the vehicle] matched Baron's DNA. On May 31, 2018, a second consensual search of

the Hyundai [vehicle] was conducted at the PSP barracks, and blood [deposits] present on the interior front driver's side door handle [were] swabbed for DNA testing.

In response to a search warrant dated July 5, 2018, [Appellant's] wireless carrier, Verizon Wireless, furnished [the] Commonwealth with [] range-to-tower information which identified the locations and movements of [Appellant's cellular telephone] on January 26, 2017. The "timing advance" or "range-to-tower data" produced by Verizon Wireless reflected that [Appellant's cellular telephone] was at Ghigiarelli's Restaurant from 12:39 a.m. to 1:45 a.m.[,] on January 26, 2017. It is noteworthy that [Appellant] transmitted a [textual message] to [Rake] at 1:27 a.m., stating "shhhh, I'll explain when I get there," thereby reflecting that he sent that text [message] while his [cellular telephone] was [located] at the restaurant. [Cell tower tracking of the cellular telephone showed that the cellular telephone moved] in a southerly direction at 1:56 a.m., and [the cellular telephone was] situated at Pagnotti Park from 2:01 a.m. to 2:15 a.m. At 2:20 a.m., [Appellant's cellular telephone] was located at the Connell Street site where Baron's Hyundai [vehicle] was later observed by [Snyder] at 6:45 a.m. From that point, the [cellular telephone] moved in the direction of [Appellant's] residence, where [Rake] stated [Appellant] arrived at approximately 3:00 a.m. and "was sweaty," "out of breath," and wearing "muddy" clothes.

The range-to-tower data indicated that from 6:26 a.m. to 8:26 a.m.[,] on January 26, 2017, [Appellant's cellular telephone] was present in Pagnotti Park. From 8:31 a.m. to 8:33 a.m., [the cellular telephone] was detected at the Connell Street location where the Hyundai [vehicle] was observed by [Snyder] at 6:45 a.m., but gone [from that location] by 9:00 a.m. according to [Snyder's wife. Appellant's cellular telephone] was next present[, from 8:38 a.m. to 8:41 a.m.,] at the second car drop site [along] Howard Street, where Baron's Hyundai [vehicle] was later found on January 29, 2017[.] Shortly after 8:41 a.m., [Appellant] was depicted on video surveillance [obtained from a gas station and convenience store] as he was walking within three-tenths of a mile of [the location along] Howard Street, and approximately 10 minutes later, his [cellular telephone] was situated at his residence at 8:51 a.m.[,] on January 26, 2017.

During the ensuing investigation, [Appellant] provided a buccal swab of his cheek cells so that his DNA profile could be

determined. The electronic file of the mixed DNA profile retrieved from the interior driver's side door handle was forwarded to Cybergenetics, which created the TrueAllele software that separates DNA mixtures for identification purposes. Utilizing that generally accepted technology, Cybergenetics determined[,] on October 24, 2019, that Baron "is thirteen point three thousand times more probable than a coincidental match" and [Appellant] "is two hundred and ninety million times more probable than a coincidental match" of the DNA extracted from the [interior portion of the driver's side door] handle. Cybergenetics conducted the same testing of the DNA mixture profile from the Hyundai's steering wheel[] and[,] on November 25, 2020, issued a report concluding that Baron was "[one] hundred forty[-]one quintillion times more probable than a coincidental match," while [Appellant] was a "five point five thousand times more probable than a coincidental match" of that [DNA] profile. Thus, both Baron and [Appellant] were statistical matches for the DNA retrieved from the Hyundai's steering wheel and interior driver's side door handle using "the most conservative match statistics."

On March 24, 2023, [Appellant] submitted to a voluntary interview at his residence that was conducted by PSP Trooper Gregory Allen [("Trooper Allen")] and Detective Turner. [Appellant] "stated he was never in Baron's Hyundai vehicle," but admitted that he [] witnessed "[Robert] Jr. break into Ghigiarelli's [Restaurant] a few times through a window" on the second floor of the property "with a ladder." He also acknowledged that he was aware of "the cash register" at Ghigiarelli's Restaurant and [Robert] Jr.'s "access to money" there, and "that he had stolen fifty dollars from [Robert] Jr." the day before Baron went missing. [Appellant] informed Trooper Allen and Detective Turner that he met [Boyle] at the [retail] store location [in] the early morning [hours on] January 26, 2017, in order to pay him the money that he owed him and to purchase narcotics from him.

On March 28, 2023, the Old Forge Police Department, Detectives from the Lackawanna County District Attorney's Office, the PSP, the [Federal Bureau of Investigation], and "the New York State Police with their cadaver dogs" conducted a search at Pagnotti Park of a 1200 square foot area that had been devised utilizing the range-to-tower data for [Appellant's cellular telephone]. Within 10 to 15 minutes, the cadaver dogs located skeletal remains that the Lackawanna County Coroner, Timothy Roland, [("Coroner Roland")] forwarded to a forensic anthropologist, Dr. Dennis Dirkmaat, who identified them as human bones. A femur

bone was transported to the PSP laboratory to be analyzed by its forensic DNA scientists, and based upon their DNA testing, they concluded that the DNA from that bone was "ten septillion times more likely to have belonged to [Baron]." Therefore, Coroner Rowland amended Baron's earlier death certificate to identify his cause of death as traumatic injuries and the manner of his death as homicide.

Trial Court Memorandum and Order, 4/24/24, at 3-9 (record citations, original brackets, extraneous capitalization, and ellipsis omitted).

On May 15, 2024, a jury convicted Appellant of the aforementioned criminal charges. On July 10, 2024, the trial court sentenced Appellant to life imprisonment for his conviction of first-degree murder.[3] That same day, the trial court imposed a sentence of 5½ to 11 years' incarceration for Appellant's robbery conviction and a sentence of 2 to 4 years' incarceration for his burglary conviction. The sentences imposed for the robbery and burglary convictions were set to run consecutively to each other and to run consecutively to the sentence of life imprisonment. Thus, Appellant's aggregate sentence was life imprisonment to be followed by a term of 7½ to 15 years' incarceration.

On July 19, 2024, Appellant filed a timely post-sentence motion that asserted, *inter alia*, that the verdict was against the weight of the evidence. Appellant filed his brief in support of the post-sentence motion on August 23, 2024. The Commonwealth filed its brief in opposition to the motion on September 19, 2024, and filed a supplemental brief on October 24, 2025. The

---

[3] The trial court gave Appellant a credit of 467 days for time served.

trial court conducted a hearing on Appellant's post-sentence motion on October 25, 2024.

On December 15, 2024, Appellant filed a notice of appeal challenging his judgment of sentence. The following day, December 16, 2024, Appellant filed a *praecipe* to enter an order denying the post-sentence motion by operation of law on November 15, 2024. On December 17, 2024, the trial court entered an order denying Appellant's post-sentence motion.

Appellant raises the following issues for our review:[4]

1. Whether [Appellant] was denied his right to cross-examine witnesses when he was precluded from questioning two witnesses regarding their conduct surrounding their respective polygraph examinations[?]

2. Whether the trial court erred in allowing a jailhouse informant to testify regarding alleged statements made by [Appellant?]

3. Whether the trial court erred in instructing the jury on accomplice liability[?]

4. Whether the guilty verdict was against the weight of the evidence because the Commonwealth relied on impermissible evidence to establish "manner of death[?]."

Appellant's Brief at 3.

Preliminarily we examine the procedural posture of this case as it implicates our jurisdiction. ***Commonwealth v. Valentine***, 928 A.2d 346, 349 (Pa. Super. 2007) (stating, "this Court can raise jurisdictional issues *sua*

---

[4] Appellant and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

*sponte*"). Pennsylvania Rule of Criminal Procedure 720, which addresses procedures pertaining to the filing of a post-sentence motion, states, in pertinent part, that,

> 3) **Time Limits for Decision on Motion.** The [trial court] shall not vacate sentence pending decision on the post-sentence motion, but shall decide the motion as provided in this paragraph.
>
> (a) Except as provided in paragraph (B)(3)(b), the [trial court] shall decide the post-sentence motion, including any supplemental motion, within 120 days of the filing of the motion. If the [trial court] fails to decide the motion within 120 days, or to grant an extension as provided in paragraph (B)(3)(b), the motion shall be deemed denied by operation of law.
>
> (b) Upon motion of the defendant within the 120-day disposition period, for good cause shown, the [trial court] may grant one 30-day extension for decision on the motion. If the [trial court] fails to decide the motion within the 30-day extension period, the motion shall be deemed denied by operation of law.
>
> (c) When a post-sentence motion is denied by operation of law, the clerk of courts shall forthwith enter an order on behalf of the [trial] court, and, as provided in Rule 114, forthwith shall serve a copy of the order on the attorney for the Commonwealth, the defendant's attorney, or the defendant if unrepresented, that the post-sentence motion is deemed denied. This order is not subject to reconsideration.

Pa.R.Crim.P. 720(B)(3)(a-c). Pursuant to Rule 720(B), when a post-sentence motion is denied by operation of law, the clerk of courts is required to file an order, on behalf of the trial court, indicating that the post-sentence motion is deemed denied by operation of law so the parties have appropriate notice that the 30-day window to perfect an appeal has begun. ***Commonwealth v.***

*Khalil*, 806 A.2d 415, 419-420 (Pa. Super. 2002) (explaining that, upon notice of the denial of a post-sentence motion by operation of law, the defendant has 30 days to perfect an appeal), *appeal denied*, 818 A.2d 503 (Pa. 2003); **see also** Pa.R.Crim.P. 720 *Comment* (stating, "[u]nder paragraph (B)(3)(a), on the date when the [trial] court disposes of the motion, or the date when the motion is denied by operation of law, the judgment becomes final for the purposes of appeal"). It is well-established that "where the clerk of courts does not enter an order indicating that the post-sentence motion is denied by operation of law and notify the [parties] of the same, a breakdown in the court system has occurred." **Commonwealth v. Perry**, 820 A.2d 734, 735 (Pa. Super. 2003).

In the case *sub judice*, Appellant filed his timely post-sentence motion on July 19, 2024. Appellant did not file a motion requesting an extension of the 120-day disposition period for his post-sentence motion. Mechanically, the trial court had until Monday, November 18, 2024, to enter an order disposing of the post-sentence motion or the motion would be deemed denied by operation of law.[5] Pa.R.Crim.P. 720(B)(3)(a). Because the trial court did not enter an order disposing of the post-sentence motion before the expiration of the 120-day disposition period, Appellant's post-sentence motion was

---

[5] **See** 1 Pa.C.S.A. § 1908 (stating that, whenever the last day of any period of time referred to in a statute "shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation").

deemed denied by operation of law on November 18, 2024.[6]  *Id.*  The clerk of courts for the Court of Common Pleas of Lackawanna County failed, however, to enter an order on November 18, 2024 that stated the post-sentence motion was deemed denied by operation of law and to provide proper notice of the same to the parties.  As such, a breakdown in the judicial system occurred.  Despite this breakdown in the judicial system, Appellant filed a notice of appeal on December 15, 2024, before the expiration of the 30-day period in which to perfect the appeal.  Therefore, we find that Appellant's judgment of sentence became final on November 18, 2024, and, despite the breakdown in the judicial system, Appellant perfected an appeal of his judgment of sentence when he filed a timely notice of appeal on December 15, 2024.  Consequently, we proceed to review Appellant's issues raised on appeal.

In his first issue, Appellant challenges the trial court's April 24, 2024 order that granted the Commonwealth's motion *in limine* to preclude reference to, and the results of, polygraph tests undergone by certain individuals, namely Robert Jr. and Cistola, that the Commonwealth anticipated calling as witnesses during Appellant's trial.

It is well-settled that in reviewing a trial court's order granting or denying a motion *in limine*, "we apply an evidentiary abuse of discretion

---

[6] Because the trial court was without power to deny Appellant's post-sentence motion after the motion was deemed denied, by operation of law, on November 18, 2024, the trial court's December 17, 2024 order denying Appellant's post-sentence motion is a legal nullity.  *Khalil*, 806 A.2d at 419-420.

standard of review." ***Commonwealth v. Stokes***, 78 A.3d 644, 654 (Pa. Super. 2013) (stating that, "[t]he admissibility of evidence is a matter directed to the sound discretion of the trial court, and an appellate court may reverse only upon a showing that the trial court abused that discretion"), *appeal denied*, 89 A.3d 661 (Pa. 2014).

"The rule in Pennsylvania is that reference to a [polygraph] test or the result thereof which raises inferences concerning the guilt or innocence of a defendant is inadmissible." ***Commonwealth v. Cain***, 369 A.2d 1234, 1241 (Pa. 1977); ***see also Commonwealth v. Chester***, 587 A.2d 1367, 1376 (Pa. 1991) (stating that, results of a polygraph test have been repeatedly and consistently held to be inadmissible for any purpose), *cert. denied*, 502 U.S. 959 (1991); ***Commonwealth v. Saunders***, 125 A.2d 442, 445 (Pa. 1956) (stating that, reference to a polygraph test, or its results, "is not judicially acceptable"); ***Commonwealth ex rel. Riccio v. Dilworth***, 115 A.2d 865, 866 (Pa. Super. 1955); ***Commonwealth v. A.R.***, 990 A.2d 1, 6 (Pa. Super. 2010), *aff'd*, 80 A.3d 1180 (Pa. 2013). "This rule was established to protect the defendant in a criminal trial[,] and it is based on [our Supreme] Court's refusal to recognize the scientific accuracy or validity of such tests." ***Cain***, 369 A.2d at 1241-1242.

Appellant asserts that "it is not the results of the polygraph or computer voice stress analyzer [examinations] that are relevant, but the statements and conduct of [Robert] Jr. and Cistola before, during, and after the administration of the polygraph and computer voice stress analyzer

[examinations]." Appellant's Brief at 21. Appellant contends that Robert Jr.'s and Cistola's "behavior and conduct before, during, and after the administration of the computer voice stress analyzer and polygraph examinations is inconstant with the conduct and behavior of innocent and honest individuals." *Id.* at 22. Appellant alleges that after Robert Jr. was informed that he did not pass the computer voice stress analysis test, "he explained that he pushed off scheduling the polygraph examination for nearly nine months because he knew he would fail the [test] and [his failure of the test] would be blown out of proportion." *Id.* Appellant also alleges that, after Cistola was informed that he did not pass the polygraph test, he "told investigators that he had snorted three bags of heroin [prior to the administering of the examination] – despite denying recent drug and alcohol use during the pre-test interview." *Id.* Appellant argues that he had "the right to confront both [individuals] on their inconsistent behavior and conduct." *Id.* Appellant asserts that "any questioning would be elicited not to show the reliability of the tests, but to show that [Robert] Jr.'s and [] Cistola's conduct and behavior was inconsistent with innocence and honesty." *Id.* at 24. Appellant argues that "it would be natural for [Robert] Jr. to cooperate with law enforcement [] in finding his father. The fact that he delayed his cooperation is relevant[,] and he should be allowed to be cross-examined on his inconsistent conduct and behavior." *Id.* at 26. Appellant also asserts that Robert Jr.'s "**belief** that he would fail the polygraph [test and not the accuracy of the polygraph examination] is relevant." *Id.* at

27 (emphasis in original). Similarly, Appellant asserts that "it's not the polygraph [test's] actual reliability [that is at issue,] but [] Cistola's conduct and behavior surrounding **his belief** of its reliability." *Id.* (emphasis in original). Appellant further contends that "after agreeing to take the polygraph [test] – and failing – [] Cistola invoked his Fifth Amendment Right to Counsel under *Miranda v. Arizona*, 384 U.S. 436 (1966). Cistola's subsequent cooperation with law enforcement after his initial invocation of his right to counsel [(namely, his explanation that he 'snorted' bags of heroin prior to taking the polygraph examination)] should have been subject to impeachment and cross[-]examination." *Id.* at 28.

The trial court explained its rationale for granting the Commonwealth's motion *in limine* as follows:

> [Appellant] correctly notes that statements made before, during, or after a polygraph examination may be admitted into evidence, provided that they do not mention or reference the performance or results of the polygraph examination. However, the contents of Robert Jr.'s foregoing statements that [Appellant] seeks to introduce are inextricably interwoven with the results of the polygraph examination. Robert Jr. cannot be questioned regarding his supposed reason for delaying his polygraph examination (*i.e.*, because he knew that he would fail it) without disclosing the actual administration of the test or revealing its results. Since a redaction which eliminates any reference to the test and its results cannot be accomplished, the Commonwealth's motion *in limine* will be granted as to Robert Jr.'s trial testimony.
>
> [Appellant] also argues that "the conduct and behavior" of "Cistola is contrary to that of innocen[ce] and honesty" in that "after [] Cistola was informed of the results of the polygraph examination, he told investigators that he had snorted three bags of heroin before the exam - despite denying using drugs and alcohol in the twenty-four hours preceding the polygraph examination[-]during

- 14 -

the pre-test interview." [Appellant] posits that "a jury can reasonably infer that [] Cistola snorted heroin, and lied about it, in an attempt to deceive the test." [T]he defense presented no evidence in support of its claim that [] Cistola's reported use of heroin before the polygraph examination somehow affected the results of that test.

. . .

Regardless of the existence or lack of scientific evidence suggesting that heroin use may impact the detection of deception during a polygraph test, [Appellant's] proffered cross-examination of [] Cistola likewise is so intrinsically intertwined with evidence of the performance and results of his polygraph examination as to render it inadmissible. The defense has not offered any means of questioning [] Cistola concerning his admitted heroin use in an alleged attempt to alter the outcome of his polygraph examination without mentioning or alluding to the test itself or its results. For that reason, any reference to [] Cistola's heroin use as a pretext to influence the polygraph test results is similarly prohibited.

. . .

Furthermore, witnesses may not be contradicted on a "collateral" matter, which "is one that has no relationship to the case at trial." The proposed cross-examination of [] Cistola concerning his pre-polygraph heroin use, in contradiction of his earlier representation that he was not under the influence of drugs or alcohol, clearly constitutes impeachment on a collateral matter.

Trial Court Memorandum and Order, 4/24/24, at 21-24 (case citations, original brackets, and record citations omitted; formatting modified).

Upon review, we discern no abuse of discretion or error of law in the trial court's order granting the Commonwealth's motion *in limine* as it relates to Appellant's proposed cross-examination of Robert Jr. or Cistola. At the hearing on the motion *in limine*, the trial court noted, and the record supports, that Appellant sought to introduce evidence that after Robert Jr. underwent the polygraph examination and failed the test, he stated that the reason he

delayed taking the test was he knew he would fail the test. N.T., 4/5/24, at 21. When asked how counsel for Appellant would introduce the statements without mentioning that Robert Jr. underwent and failed a polygraph test, counsel for Appellant conceded that it "would be cutting the line very closely" as to the rule prohibiting evidence concerning a polygraph test. *Id.* Regarding statements made by Cistola that he used illegal narcotics prior to undergoing the polygraph test, counsel for Appellant asserted that these statements "would go to show that he was possibly trying to trick the [polygraph] test" and to impeach his statement to law enforcement that he was not under the influence of, *inter alia*, a controlled substance prior to undergoing the polygraph test. *Id.* at 23. As the trial court noted, and we agree, this Court has permitted introduction of statements that were made before, during, or after the administration of a polygraph test. Aside from other evidentiary hurdles that must be met before a statement may be introduced into evidence, *i.e.*, relevance, voluntariness, and hearsay, the admission of such statements may only occur if the statements can be introduced without reference to a polygraph test or the results thereof. *See Commonwealth v. Schneider*, 562 A.2d 868, 870-872 (Pa. Super. 1989) (stating that, "a statement given after being advised that one has failed a [polygraph test] may be admitted into evidence" provided law enforcement has not misled the individual regarding the admissibility of the results of a polygraph test), *appeal denied*, 575 A.2d 564 (Pa. 1990); *see also Commonwealth v. Santiago*, 591 A.2d 1095, 1104 n.15 (Pa. Super. 1991) (reiterating that, a statement made during

the polygraph examination may be admissible provided the results of the [examination] are not disclosed), *appeal denied*, 600 A.2d 953 (Pa. 1991); ***Commonwealth v. Hoffman***, 311 A.3d 625, 2023 WL 9018418, at *3 (Pa. Super. filed Dec. 29, 2023) (unpublished memorandum) (finding that, the trial court properly admitted statements Hoffman made during the polygraph interview because no reference was made to the polygraph examination or the results thereof), *appeal denied*, 322 A.3d 151 (Pa. 2024); ***Commonwealth v. Vasquez***, 237 A.3d 462, 2020 WL 2537214, at *4 (Pa. Super. filed May 19, 2020) (unpublished memorandum). Here, the trial court found, and the record supports, that the statements made by Robert Jr. and Cistola could not be introduced without mentioning, or implying, to the jury that the two individuals had undergone polygraph examinations and, ultimately, failed those tests. Therefore, we discern no error in the trial court's ruling that precluded Appellant from cross-examining Robert Jr. and Cistola regarding their statements to law enforcement because Appellant's proposed inquiry could not be conducted without reference to the polygraph tests, or the results thereof. ***See Commonwealth v. Handfield***, 34 A.3d 187, 212 (Pa. Super. 2011) (affirming that, a trial court may preclude cross-examination of a witness where the inquiry would reference a polygraph examination, and the results thereof), *appeal denied*, 54 A.3d 347 (Pa. 2012).

In his second issue, Appellant challenges the trial court's order that denied his motion *in limine* to preclude certain testimony from Carlos Perez, who, according to Appellant, is a jailhouse informant. Appellant argues that

his statements to Perez were made while under the influence of Suboxone, a controlled substance, supplied by Perez and the Commonwealth benefited from Perez's illegal acts.[7]  Appellant's Brief at 29-31.  As stated *supra*, we review the trial court's order denying Appellant's motion *in limine* for an abuse of discretion.  **Stokes**, 78 A.3d at 654.

It is well-established that

The Sixth Amendment right to the assistance of counsel attaches at the initiation of formal judicial proceedings against an individual by way of formal charge, preliminary hearing, indictment, information, or arraignment.  Any statement made by the individual thereafter which is "deliberately elicited" by police, without the individual making a valid waiver of the right to counsel, is deemed a contravention of this right.  A statement may be "deliberately elicited" by police through use of an informant. "Information secured by an informant acting as an agent of the government must be suppressed where the informant acts under instructions as an informant for the government, where he presents himself as no more than a fellow inmate rather than a governmental agent, and where the suspect is in custody and under indictment at the time of the questioning by the informant because such questioning outside the presence of the accused's counsel violates the accused's Sixth Amendment right to counsel.

In order to prove such a violation, the defendant must demonstrate the police and the informant took some action, beyond mere listening, designed deliberately to elicit incriminating remarks.  Additionally, the defendant must show the informant was acting as a government agent.  Individual acts do not become

_____

[7] Suboxone is a prescription medication that contains buprenorphine, which is classified as a Schedule III controlled substance, and naloxone, which is an opioid antagonist that is used to temporarily reverse the effects of an opioid overdose.  **Commonwealth v. Arnold**, 284 A.3d 1262, 1266 n.3 (Pa. Super. 2022); **see also** 35 P.S. § 780-104(3)(i)(11); **Commonwealth v. Jackson**, 2020 WL 918813, at *1 n.2 (Pa. Super. filed Feb. 26, 2020) (unpublished memorandum).  Suboxone is used to treat opioid addiction.

governmental action merely because they are later relied upon and used by the government in furtherance of governmental objectives.

***Commonwealth v. Hannibal***, 156 A.3d 197, 212-213 (Pa. 2016) (citations and some quotation marks omitted), *cert. denied*, 583 U.S. 830 (2017).

Appellant asserts that Perez was acting as a government informant when "he obtained Suboxone and illegally administered that substance to [Appellant] with the intent of eliciting incriminating statements for his own benefit." Appellant's Brief at 29. Appellant contends that any alleged incriminating statements he made to Perez were "drug-induced" and "not of [his] free will" and, therefore, should have been suppressed. ***Id.*** at 31. Appellant further argues that "serious policy considerations are implicated when an inmate, whether acting at the direction of the government[,] or not, may believe [that he or she] can gain favor with [the Commonwealth] by drugging other inmates[.]" ***Id.***

In denying Appellant's motion *in limine* to suppress the incriminating statements that he allegedly made to Perez while incarcerated, the trial court explained that

> [Appellant] presented no proof that [] Perez was acting as an agent for the [Commonwealth] at the time of their jailhouse conversations, and the only material contained in the record reflects that [] Perez did not contact the authorities until after [Appellant] allegedly confessed to [] Perez that [Appellant] killed Baron. Under those circumstances, [Appellant] cannot establish a constitutional basis for precluding evidence of any statements that he made to [] Perez [while incarcerated. A] voluntary jailhouse admission to a fellow inmate is not subject to any more protection than a confession made by [a] defendant outside of his [or her] jail cell to another person willing to notify authorities.

- 19 -

[Appellant] alternatively contends that his statements to [] Perez should be excluded on the ground that they were not given knowingly, intelligently, and voluntarily since "[Appellant] was intoxicated from Suboxone given to him by [] Perez." [Appellant's] argument in this regard is misplaced since the requirement that statements be furnished "knowingly, intelligently, and voluntarily" applies to the admissibility of statements given by a defendant during custodial interrogation by police after the defendant has been advised of [his or her] rights under **Miranda v. Arizona**, 384 U.S. 436 (1966) and has knowingly , intelligently, and voluntarily waived those rights. The case *sub judice* does not involve an instance where a defendant was so intoxicated or impaired that [he or she] was "too incoherent to knowingly or intelligently waive [his or her] **Miranda** rights and voluntarily confess while in custody" and, therefore, lacked sufficient cognitive awareness to understand those rights and effectively waive them.

Rather, the record presented for review establishes that [Appellant] voluntarily used Suboxone with [] Perez and[,] therefore[,] provided inculpatory statements directly to him, not the police. To the extent that [Appellant] was intoxicated or impaired as a result of his Suboxone use, his condition does not affect the admissibility of his alleged confession, and instead[,] merely impacts the weight to be accorded to [] Perez's testimony concerning [Appellant's] apparent confession.

Trial Court Memorandum and Order, 4/24/24, at 26-28 (citations omitted).

In **Commonwealth v. Franciscus**, 710 A.2d 1112 (Pa. 1998), our Supreme Court found that, prior to "deliberately [eliciting] inculpatory information from Franciscus," the jailhouse informant "expected to receive a lenient recommendation in exchange for information" based upon his prior history with law enforcement. **Franciscus**, 710 A.2d at 1120. The record demonstrated that the jailhouse informant had an "express understanding" with law enforcement that the information he provided would be rewarded "with the appearances of the law enforcement officers at the sentencing

hearing" and that law enforcement officers deposited funds into his prison account, protected the informant from other inmates, and transferred the informant to another prison system once his cooperation with law enforcement had been discovered by other inmates in order that he could continue to supply information to law enforcement. *Id.* Under the circumstances of that case, our Supreme Court agreed that the jailhouse informant was acting as a government agent and that his solicitation of incriminating information violated Franciscus's Sixth Amendment rights.[8] *Id.* at 1121.

In contrast, our Supreme Court, in *Hannibal*, *supra*, found that the jailhouse informant was not acting as a government agent when Hannibal confessed to him that he murdered another individual. *Hannibal*, 156 A.3d at 213. The *Hannibal* Court noted that "[t]here was no evidence the government enlisted or directed [the jailhouse informant] to initiate contact with [Hannibal] and elicit details about the [case.]" *Id.* at 214. The jailhouse informant "testified he was not expecting any leniency in his [own pending criminal matter] in exchange for his testimony" implicating Hannibal. *Id.* at 213; *see also id.* at 214 (noting that, although the jailhouse informant "may have hoped his cooperation might result in consideration in his own cases, there was no promise of leniency in exchange for testimony"). The *Hannibal*

---

[8] The *Franciscus* Court "noted that the situation [involving Franciscus and the jailhouse informant] was distinguishable from the case in which an inmate unexpectedly comes forward with incriminating information about a fellow inmate, or where an informant is a passive listener to a heartfelt confession." *Franciscus*, 710 A.2d at 1120.

Court further expressed that "whatever promises or expectations arose after [the jailhouse informant] came forward do not operate retroactively to make [the informant] an interrogating agent of the police." *Id.* at 214.

In his motion *in limine*, Appellant asserted that Perez knew the circumstances of Appellant's criminal case and that Perez "drugged [Appellant] in an effort to make him confess his involvement in the murder of [Baron]." Motion *In Limine*, 3/5/24, at ¶22(b)(i). Appellant averred that, Perez's statement, during a police interview, - "I have been doing this for a long time and I know the . . ." – "suggests [Perez] has acted as an informant in the past."[9] *Id.* at ¶22(a)(i) and (ii). At the hearing on Appellant's motion *in limine*, Appellant presented no additional evidence, or argument, regarding Appellant's assertion that Perez was working as a government agent at the time Appellant confessed to him beyond the mere allegations contained in Appellant's motion *in limine*. *See generally*, N.T., 4/5/24. Upon review, we concur with the trial court, and the record supports, that Perez's actions of obtaining Suboxone, sharing the controlled substance with Appellant, and engaging in a discussion with Appellant regarding the murder of Baron do not give rise to "governmental actions." Absent evidence, which Appellant did not provide, that Perez undertook these actions at the direction of, or with the

---

[9] The full context of Perez's statement to law enforcement, according to Appellant, was "I've been doin' this for a long time and like I know the . . . I know when a motherfucker is lyin' to me ya know?" Motion *In Limine*, 3/5/24, at ¶20.

knowledge of, law enforcement to obtain rewards in exchange for incriminating testimony, Appellant failed to establish that Perez was acting as a government agent. As such, we discern no error of law or abuse of discretion in the trial court's order denying Appellant's motion *in limine* to preclude Perez's testimony.

In his third issue, Appellant challenges the trial court's jury instruction on accomplice liability. Appellant's Brief at 32-33. To preserve a claim that a jury instruction was erroneously given, Appellant must have objected to the charge at trial before the jury retired to deliberate. ***Commonwealth v. Parker***, 104 A.3d 17, 29 (Pa. Super. 2014) (finding that, the failure to object at the conclusion of the charge and prior to the retirement of the jury for deliberation constituted waiver, despite the defendant having objected to the charge during the charging conference), *appeal denied*, 117 A.3d 296 (Pa. 2015); ***see also*** Pa.R.Crim.P. 647(C) (stating, "No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate. All such objections shall be made beyond the hearing of the jury."). "[T]he mere submission and subsequent denial of proposed points for charge that are inconsistent with or omitted from the instructions actually given **will not suffice** to preserve an issue, absent a specific objection or exception to the charge or the trial court's

ruling respecting the points."[10] **_Commonwealth v. Pressley_**, 887 A.2d 220, 225 (Pa. 2005) (emphasis added). "Although obligating counsel to take this additional step where a specific point for charge has been rejected may appear counterintuitive, as the requested instruction can be viewed as alerting the trial court to a defendant's substantive legal position, it serves the salutary purpose of affording the [trial] court an opportunity to avoid or remediate potential error, thereby eliminating the need for appellate review of an otherwise correctable issue." **_Id._** at 224 (footnote omitted); **_see also Parker_**, 104 A.3d at 29; **_Commonwealth v. Knight_**, 241 A.3d 620, 625 (Pa. 2020) (stating, "no portion of a jury charge or omissions therefrom may be assigned as error, unless specific objections are made before the jury retires to deliberation"); **_Commonwealth v. Crosby_**, 224 A.3d 372, 422 (Pa. Super. 2019) (stating, "objections [raised] at the charging conference [are] not sufficient to preserve [a] challenge to [a jury instruction] issued by the trial court; the party must object after the charge is given to the jury), _vacated on other grounds_, 252 A.3d 1092 (Pa. 2021).

In the case _sub judice_, Appellant, after the conclusion of the charging conference on May 13, 2024, raised an objection to the trial court's proposed

---

[10] After the trial court announced its decision regarding Appellant's objection to the accomplice liability instruction, Appellant did not lodge an objection on the record prior to the charge being given to the jury. N.T., 5/14/24, at 9.

jury instruction on accomplice liability.[11]  N.T., 5/14/24, at 2.  The following day, the trial court, prior to charging the jury, overruled Appellant's objection.  *Id.* at 9.  The trial court then proceeded to instruct the jury on, *inter alia*, the accomplice liability theory as it pertained to Appellant's criminal charge of murder of the second degree, 18 Pa.C.S.A. § 2502(b).  N.T., 5/14/24, at 22-26.  After concluding its charge of the jury, the trial court asked both parties if they wished to raise any matters before the jury retired for deliberation.  *Id.* at 99.  Both Appellant, as well as the Commonwealth, responded in the negative.  *Id.*  Because Appellant failed to object to the jury instruction on accomplice liability after the charge was provided to the jury and before the jury retired for deliberation, we find Appellant waived this issue.[12]  ***Pressley***, 887 A.2d at 225; ***see also Parker***, 104 A.3d at 29.

_____

[11] The trial court provided the parties with proposed jury instructions on May 13, 2024, and asked the parties to raise any objections at a charging conference scheduled for later that same day.  N.T., 5/14/24, at 2.  At the charging conference, the only objection raised pertained to a typographical error on the verdict slip.  *Id.*  Later that same evening, Appellant raised, *via* electronic mail, an objection to the proposed jury instruction on accomplice liability, and the Commonwealth subsequently provided a response.  *Id.*  Despite Appellant's failure to raise his objection to the jury instructions at the charging conference, the trial court proceeded to dispose of the objection on May 14, 2024.  *Id.* at 5-9.

[12] Moreover, we concur with the trial court, and the record supports, that even if the jury instruction on accomplice liability was in error, Appellant was not harmed by the error since the instruction was provided as part of the charge regarding the criminal charge of second-degree murder, which the jury did not consider in light of its decision to convict Appellant of the first-degree murder charge.  ***See*** N.T., 5/14/24, at 22 (instructing the jury to consider the verdict slip question regarding second-degree murder only if the jury does not

Appellant's final issue raises a claim that the jury's verdict was against the weight of the evidence on the ground that the Commonwealth relied on impermissible evidence to establish the manner of death. Appellant's Brief at 33-35.

> Appellate review of a weight claim is a review of the exercise of [the trial court's] discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial [court] had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial [court] when reviewing a trial court's determination that the verdict is[, or is not,] against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the [trial] court's conviction that the verdict was[,] or was not[,] against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Horne*, 89 A.3d 277, 285 (Pa. Super. 2014), *citing Commonwealth v. Widmer*, 744 A.2d 745 (Pa. 2000); *see also Commonwealth v. Rodriguez*, 340 A.3d 334, 349 (Pa. Super. 2025) (stating, "the function of an appellate court is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence" (citation omitted)). A trial court abuses its discretion "where the course

_____

find Appellant guilty of first-degree murder); *see also Commonwealth v. Frein*, 206 A.3d 1049, 1075 (Pa. 2019) (stating, "[a] jury is presumed to follow the trial court's instructions on the law"); *Commonwealth v. Allshouse*, 36 A.3d 163, 182 (Pa. 2012) (stating, "a defendant is entitled to a fair trial but not a perfect one" (citation, original quotation marks, and brackets omitted)).

pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias[,] or ill-will." **Horne**, 89 A.3d at 285-286 (citation omitted); **see also Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013) (stating, "[t]he term 'discretion' imports the exercise of judgment, wisdom[,] and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the [trial court]"). By comparison, "the role of the trial court is to determine whether, notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice." **Rodriguez**, 340 A.3d at 349 (citation omitted). For an appellant to prevail on a weight of the evidence claim, "the evidence must be so tenuous, vague[,] and uncertain that the verdict shocks the conscience of the [trial] court." **Commonwealth v. Sullivan**, 820 A.2d 795, 806 (Pa. Super. 2003) (citation and internal quotation marks omitted), *appeal denied*, 833 A.2d 143 (Pa. 2003).

Appellant asserts that the Commonwealth presented the testimony of Coroner Rowland to establish the manner of death as homicide. Appellant's Brief at 33. Appellant argues that "the Commonwealth's reliance solely on case history, as told to the [c]oroner, without supporting physical evidence is legally insufficient in supporting the determination on [manner] of death." **Id.** at 34-35, *relying on*, **Commonwealth v. Walters**, 323 A.3d 151 (Pa. 2024). Appellant contends that "because the determination of the coroner that the

manner of death was homicide was not based on any competent medical or scientific evidence, the coroner's testimony was impermissible."[13]  Appellant's Brief at 35.  According to Appellant, the trial court erred in admitting the coroner's testimony regarding the manner of death and, as such, the Commonwealth failed to establish the manner of death as homicide.[14]  *Id.* Without an established manner of death, that is to say proof of an unlawful killing, the jury's guilty verdict, according to Appellant, was against the weight of the evidence.  *Id.*

_____

[13] To the extent that Appellant challenges the testimony of Coroner Rowland in the context of his weight claim, we find Appellant's evidentiary claim to be waived for failure to lodge an objection at the time Coroner Rowland presented his testimony at trial.  *See* N.T., 5/13/24, at 11 (demonstrating that Appellant did not object to Coroner Rowland's testimony regarding either the cause of death or the manner of death, nor did Appellant cross-examine Coroner Rowland); *see also* Pa.R.E. 103(a)(1)(A) (stating that, a party may claim error in a ruling to admit evidence only if the party makes, *inter alia*, a timely objection); Pa.R.A.P. 302(a) (stating, "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal").

[14] To the extent that Appellant asserts there was insufficient evidence to establish the element of an unlawful killing to support a conviction of first-degree murder, we find this issue waived for failure to raise the issue in his Rule 1925(b) statement.  *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) (stating, "[a]ny issues not raised in a [Rule] 1925(b) statement will be deemed waived"); *see also* Rule 1925(b) Statement, 1/21/25, (failing to set forth a sufficiency of the evidence claim); *Commonwealth v. Johnson*, 985 A.2d 915, 920 (Pa. 2009) (stating that, to convict a person of first-degree murder, the Commonwealth must prove that "(1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill" (citation omitted)). Moreover, a weight of the evidence claim "concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence."  *Rodriguez*, 340 A.3d at 349 (citation and original quotation marks omitted).

In considering Appellant's claim that his first-degree murder conviction was against the weight of the evidence,[15] the trial court stated,

> the jury was at liberty to accept and believe the plethora of DNA, [cellular telephone] range-to-tower, serology, forensic, electronic communication, testimonial, and photographic evidence of [Appellant's] guilt[. Appellant] has not established that notwithstanding all that evidence, certain other facts are so clearly of greater weight that it constitutes a denial of justice to ignore them or to not accord them equal weight. Nor has the defense demonstrated that the Commonwealth's evidence was so tenuous, vague and uncertain that the jury's verdict shocks the conscience of the court.

Trial Court Memorandum and Order, 12/17/24, at 41 (quotation marks omitted).

Based upon our review of the record, we discern no abuse of discretion or error of law in the trial court's denial of Appellant's post-sentence motion asserting a claim that his conviction of first-degree murder was against the weight of the evidence based upon the admission of Coroner Rowland's testimony. As the trial court detailed in great length, *see id.* at 2-16, the Commonwealth presented "an ocean" of evidence demonstrating Appellant's

_____

[15] In his post-sentence motion, Appellant asserted that his first-degree murder conviction was against the weight of the evidence because, *inter alia*, "[t]here was no medical testimony provided to establish the cause of [Baron's] death[.]" Post-Trial Motion, 7/19/24, at ¶27(a). In so arguing Appellant conflates the term "cause of death," meaning the "but-for" cause of the death, *i.e.*, specific injury or disease, with the term "manner of death," which refers to the circumstances under which the death occurs, *i.e.*, accident, suicide, or homicide. ***See Commonwealth v. Fitzpatrick***, 316 A.3d 987, 1000 (Pa. Super. 2024) (distinguishing between the terms "cause of death" and "manner of death").

culpability in the murder of Baron of which Coroner Rowland's testimony that the cause of death was "traumatic injuries" and, in particular, the manner of death was "homicide" represented only a granular of sand in that vast ocean. To the extent that Appellant's claim invites this Court to reassess the witnesses' credibility and reweigh the evidence in an attempt to convince us to reach a result different than the one reached by the jury, as fact-finder, we decline Appellant's invitation. The jury, as fact-finder, while passing on the credibility of the witnesses and weight of the evidence, was free to believe all, part, or none of the evidence. *Commonwealth v. Dunkins*, 229 A.3d 622, 631 (Pa. Super. 2020), *aff'd*, 263 A.3d 247 (Pa. 2021), *cert. denied*, 142 S.Ct. 1679 (2022).

Judgment of Sentence affirmed.


Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary


Date: 10/20/2025